IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

THE LAW COMPANY, INC.,
A Kansas Corporation,

                Plaintiff,

          vs.                         Case No. 06-1043-JTM

MOHAWK CONSTRUCTION AND
SUPPLY COMPANY, INC.,
A Pennsylvania Corporation,

                Defendant.

## MEMORANDUM AND ORDER

This matter is before the court on the motion for summary judgment filed by plaintiff The Law Company, Inc., seeking dismissal of most of the damages claimed by defendant Mohawk Construction and Supply Company's counter-claim. For the reasons sated herein, the court will hereby grant the motion by Law.

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party. *McKenzie v. Mercy Hospital*, 854 F.2d 365, 367 (10th Cir. 1988). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Ellis v. El Paso Natural Gas Co.*, 754 F.2d 884, 885 (10th Cir. 1985). The moving party need not disprove plaintiff's claim; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir. 1987).

In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs.  Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).  Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts.  "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a **genuine issue for trial**.'"  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis in *Matsushita*).  One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose.  *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

**Findings of Fact**

On May 8, 2003, Law entered into a contract with Cessna Aircraft Company, agreeing to construct a building known as the Cessna C-10 Citation Service Center.  In exchange for $44,854,000, Law agreed to build the Service Center within 540 calendar days, i.e., November 3, 2004. The contract provided for liquidated damages payable to Cessna in the amount of $5,000.00 for every day the project was late. The contract provided;

> Extension of time shall be the Contractor's sole remedy for delay unless the same shall have been caused by Cessna's intentional interference with the Contractor's performance of the work, and then only after the Contractor's notice to Cessna of such interference. Changes in the scope of work, suspension of the work, and correction of defective work shall not be construed as intentional interference with the Contractor's performance.

(Kimple Affidavit, Attachment 1, Article 4.3).

2

The 458,000 square feet Service Center building includes an office area - known as "Building D" - and five aircraft service center hangars.  The hangars to the north of Building D are commonly referred to as Buildings A and C; those on the south are Buildings E, F and G.

On May 13, 2003, Law subcontracted with Steel Service Corporation, which agreed to fabricate and erect the structural and miscellaneous steel, metal deck, and bar joists for the project. The contract provided that erection of structural steel would begin in mid-August 2003 and would be substantially complete within four months, or by Christmas 2003. The parties agreed that erection would start in Building D and then proceed simultaneously in both hangar bay wings (north and south of Building D).

On or about May 21, 2003, Law subcontracted with Mohawk Construction and Supply Co., Inc., for Mohawk to install all metal wall panels, interior liner panels, hangar doors, draft stops, and exterior enclosure fences on the Service Center.

Section 3 of the Mohawk Subcontract contained the following provisions:

3.1 Contractor shall prepare the construction Schedule for the Project and revise the Schedule as work progresses to achieve the earliest possible completion of the Project.  Subcontractor shall immediately furnish all information pertaining to the Subcontract Work requested by Contractor for implementation and revision of the Schedule. Subcontractor recognizes that revisions will be made to the Schedule and agrees to comply with such revisions without additional compensation. Subcontractor shall attend all on-site meetings regularly scheduled, or specially called by Contractor's project manager or superintendent with not less than three (3) days' written, facsimile or telephoned notice to Subcontractor. In the event of the absence of Subcontractor at any such Project meeting, Subcontractor shall be bound by any decisions or directives issued by Contractor at such meeting concerning the Schedule and/or the progress of the Project.
....
3.3 No extension of time for performance of the Subcontract Work shall be claimed by Subcontractor, or allowed to it, unless Subcontractor shall have submitted a written request to Contractor within two (2) days after occurrence of the cause of such request and unless (i) Owner grants Contractor an extension of the Project substantial or final completion date for said occurrence or (ii) Contractor and Subcontractor have otherwise agreed in writing as to the amount of additional time allowed. It is understood that delays in Subcontractor's performance which occur by reason of its inability to secure timely delivery of materials, equipment, or sufficient manpower shall not constitute grounds for an extension of time under this Subcontract. In the event Contractor is liable for liquidated or other damages by reason of late completion of the Project, Contractor may assess against Subcontractor that portion of said damages attributable to any delay by Subcontractor.
...

3

> 3.5 Subcontractor agrees to make no claims against Contractor or Owner should the Schedule not be strictly adhered to, it being understood that Contractor will endeavor to expedite completion of the Project as rapidly as possible.

(Mohawk Depo. Exhibit 2).

The Mohawk Subcontract contains certain Supplementary Conditions which are "intended to adapt the Base Agreement to this specific Project." Section 4.4 of the Supplementary Conditions provides as follows:

> Subcontractor specifically acknowledges that extension of time shall be Subcontractor's sole remedy for delay unless the same shall have been caused by Owner's or Contractor's intentional interference with the Subcontract Work, and then only after Subcontractor has provided timely notice to Contractor and Owner has approved such request for extension. In accordance with Subparagraph 4.3 of the General Contract, changes in the scope of the Subcontract Work, suspension of the Subcontract Work, and correction of defective Subcontract Work shall not be construed as intentional interference with Subcontractor's performance

.

(Mohawk Depo. Exhibit 2; Kimple Affidavit, at 7).

Section 27 of the Mohawk Subcontract provides as follows:

> Entirety of Subcontract. This Subcontract, Schedule A and Schedule B, and the provisions thereof, represent the entire agreement of the parties as to the Subcontract Work to be performed by Subcontractor and may not be amended, altered, modified or terminated (except as provided in §11.) except by the written agreement of the parties. In the event of any conflict between any of the Contract Documents and the provisions of this Subcontract (including Schedule A and Schedule B), the latter shall prevail.

(Mohawk Depo. Exhibit 2; Kimple Affidavit, at 8).

Mark Cybulski was Mohawk's project manager for this job. He read the Mohawk subcontract before he executed it. He has executed hundreds of agreements of this type. He read the sentence in Section paragraph 3.1 of the Mohawk subcontract which states, "Subcontractor recognizes that revisions will be made to the schedule and agrees to comply with such revisions without additional compensation." Cybulski testified that that is what actually happened on this job because, "We were supposed to start in September and when I was at the job site and we got an official schedule at that time we saw that we couldn't start in September. And I made up a schedule for our work based on

4

that job site meeting. So that meant to me that since the job was pushed back that it was just the way it was going to be." (Cybulski Dep. at 22-23).

The Mohawk subcontract provided that installation was currently scheduled to commence in early September 2003 and that the overall wall panel installation would be completed in 48 working days.

The steel erection was delayed. Steel erection on this job, as on all jobs of this type, was on the critical path. That is, most of the other work on the project, including installation of the metal wall panels, could not commence in certain areas until the steel was erected.

Mohawk contracted with Viking Erectors Corp. to perform all labor necessary to fulfill Mohawk's duties under Mohawk subcontract. It did so through a written purchase order which called for a fixed price payment to Viking of $550,000. Subsequent change orders added $60,000-$70,000 to the purchase order.

Although the shareholders of Viking are also the shareholders of Mohawk, Viking is not a subsidiary of Mohawk. Viking is a separate corporation with its own tax identification number.

Mike Parker is an employee of Viking. He has never been an employee of Mohawk. He served as Viking's representative on the project.

Viking personnel came to the job site on November 7, 2003. Viking employees recorded their time thereafter. At no time did Mohawk advise Law that Viking employees were actually doing the erection of the metal panels. Mohawk never gave a copy of its purchase order with Viking to Law. Cybulski testified, "I had a contract with a customer[,] and because my labor [. . .] they don't need to see my labor." (Cybulski Dep. at 82).

On December 5, 2003, Mark Cybulski of Mohawk notified Law that various areas of the job were in a condition such that Mohawk could not commence work. On August 5, 2004, Mohawk wrote Law stating,

> Since the onset of the construction of the project, we have been experiencing major delays and schedule changes which are having a significant cost impact on our total scope of work. Since the causes of these delays and changes are definitely not

5

attributable to Mohawk, we feel justified in submitting this request for reimbursement of these costs.

The letter went on to set forth damages in various categories and made a total claim of $233,047. (Mohawk Dep. Exh. 20).

In November 2004, Mohawk advised Law that its work was complete. Through a letter dated November 17, 2004, Mohawk added another month of alleged delay to its claims, increasing its total damage claim to $255,753.

Mohawk is not making any claim for overtime expenses. Viking's representative, Mike Parker, believes the only overtime work by Viking was one Saturday to get out of another contractor's way. However, in its August 5, 2004, claim letter, Mohawk sought damages for "wage escalation." This refers to the increased cost to Viking for the wage escalation at the union. The letter's claim for "foreman costs" all relate to Viking's Parker.  Mohawk's claim for damages are based on alleged delays and schedule changes: "[W]e have been experiencing major delays and schedule changes which are having a significant cost impact on our total scope of work." (Mohawk Depo. Exhibit 20; Cybulski Depo., p. 100:9-15).

In the Pretrial Order, Mohawk contends that its alleged damages were incurred due to "numerous Project delays, suspensions of work, out-of-sequence work, and inefficiently performed work . . .." (Doc. 41, p. 7). As acknowledged by Mohawk in the Pretrial Order, the fifth required element of proof for its breach of contract claim against Law Company is "[d]amages to Mohawk caused by the breach." (Doc. 41, p. 10). And, as identified in the Pretrial Order, an issue of fact in this action is "the amount of Mohawk's damages."

In its Notice of Rule 30(b)(6) Deposition directed to Mohawk, Law identified one of the topics of intended inquiry as follows:

> All contentions of Mohawk concerning the damages Mohawk claims to have suffered as a result of the alleged breach of the Law Company / Mohawk Subcontract, including Mohawk's subjective beliefs and opinions regarding the cause or causes of the damages and its monetary valuation of those damages.

(Dkt. No. 30, at 2).

Mohawk designated its expert witness, Dominick DeSalvo, to speak on its behalf regarding its alleged damages and the causes of those alleged damages.

DeSalvo's role as Mohawk's damages expert was to calculate "[d]elay and disruption" damages. (DeSalvo Depo., pp. 27:2-5; 30:4-7). He has produced an expert report in which he has opined that Mohawk is entitled to recover $634,403.23 in damages. With the exception of $9,919 in alleged "Rework" damages and a claim for prejudgment interest, all of the damages opined to by DeSalvo are presented as having been caused by delay or rescheduling.

Mohawk's witnesses conceded in deposition that they were not contending that Law intentionally interfered with the subcontract work.

According to DeSalvo, the person designated to speak on behalf of Mohawk about its alleged damages, all of the damages being sought by Mohawk in this action were actually allegedly suffered by Viking, with the exception of the overhead and profit Mohawk wishes to add to Viking's alleged damages. (DeSalvo Dep. at 32:4-24). DeSalvo testified that it was his opinion that Mohawk suffered damages from being on the job longer than they should have been or anticipated being. However, he went on to explain that the company on the job longer was actually Viking.

DeSalvo set forth five categories of damages, together with overhead, profit, and interest. He used Cybulski's claim letters of August and November 2004 to help formulate his report. The first category of damages, "labor escalation," sets forth the same amount as that claimed by Cybulski. The second category of damages, "extended general foreman's costs," sets forth the same amount, $7,800 per month, as that claimed by Cybulski (except that DeSalvo used a longer period of months). DeSalvo's third category of damages, "extended use of equipment and utilities," sets forth the same amount, $14,400 per month, as that claimed by Cybulski. DeSalvo did nothing to confirm these numbers or the math behind them. The fourth category of damages, "rework," is simply a dispute between Law and Mohawk about whether extra work was done. DeSalvo is not stating an opinion on this dispute or the amount claimed. He simply included the amount. The final category of damages, "loss of labor productivity," was based on Viking's cost report. He thereafter put a cost of

7

"seasonal impact" because some of the work was done in the winter. He also uses a 20% overhead and 10% profit figure. However, he acknowledged the Mohawk Subcontract limited overhead and profit to 5%, and admitted that his figure should be adjusted to that.

On January 24, 2006, Mark Cybulski, on behalf of Mohawk, executed under oath and delivered to Law Company, a certificate of payment in order to induce Law to pay to Mohawk the retainage on the Mohawk subcontract. In that sworn statement, Mohawk made several certifications, including the following: "(c) all persons or entities from whom Subcontractor obtained labor, materials, or equipment for the Project have been paid in full and no such person or entity has any claim or lien against the Project for work performed on the Project, or labor, materials, or equipment supplied for the Project." The certification further stated that Mohawk was reserving only the right to claim or recover damages incurred by subcontractor (Mohawk) at the project.

When asked to describe what actions or inactions by Law Company support Mohawk's claim that Law Company has waived and should be estopped from relying upon the Mohawk subcontract provisions that prevent Mohawk from making delay and scheduling damages claims, Mohawk's Mark Cybulski presented the following allegations concerning conversations he allegedly had with Law Company's project manager, Doug Kimple — that he asked Kimple why there was no formal response to Mohawk's February 20, 2004 claim letter, that Kimple never said Mohawk would not be paid for delays in the schedule, and its concerns about not getting its work in a timely manner would be "taken care of."

The court finds that the facts cited above are those in the action which are material to Law's motion and which are supported by admissible evidence. In response to Law's motion, Mohawk submitted a response which addresses in detail various allegations against Law. However, the court finds none of these factual allegations is sufficient to create any issue of fact preventing an award of summary judgment, and the court excludes the requested findings of fact from the present order. First, many of the facts now advanced by Mohawk are premised solely upon a variety of documents for which no authentication by any witness is offered. However, "[u]nauthenticated documents, once

8

challenged, cannot be considered by a court in determining a summary judgment motion." *Bell v. City of Topeka*, 496 F.Supp.2d 1182, 1184 (D. Kan. 2007). *See also Powers v. Tweco Products*, 206 F. Supp. 2d 1097, 1103 (D. Kan. 2002); *IBP, Inc. v. Mercantile Bank of Topeka,* 6 F. Supp.2d 1258, 1263 (D. Kan.1998). Second, much of the remainder of Mohawk's factual averments are now presented by means of very lengthy affidavits from two witnesses  (Dave Kowcheck and Mark Cybulski) who now advance factual positions different from those reflected in their depositions.  No justification exists to support the change. *Rios v. Bigler*, 847 F. Supp. 1538, 1546 (D. Kan. 1994). Third, most of the factual narrative which Mohawk attempts to create simply has no relevance to the issues before the court as framed by the Pretrial Order and defendant's motion.

**Conclusions of Law**

Section 4.4 of the contract provides that "extension of time shall be Subcontractor's sole remedy for delay," except where the delay was intentionally caused by Law. Mohawk's expert explicitly testified there was no claim that Cessna or Law intentionally delayed the project.  Under Section 3.3, Mohawk expressly stated that it "recognizes that revisions will be made to the Schedule and agrees to comply with such revisions without additional compensation."  The court finds that the present provisions bar the majority of Mohawk's present claims for damages against Law.

In *Kansas City Structural Steel Co. v. L.G. Barcus & Sons, Inc.*, 217 Kan 88, 535 P.2d 419 (1975), the Kansas Supreme Court upheld the application of a comparable damages limitation provision.  While the clause in *Kansas City Structural Steel* was not the same as that presented here, the court generally recognized the validity of such agreements:

> The exculpatory clause before use does not totally exclude liability for damages in case of a breach, although there is respectable authority that even **total** exclusion of consequential damages may be the subject of a valid provision in a commercial sales agreement entered into at arms' length. (*K & C, Inc. v. Westinghouse Elec. Corp.*, 437 Pa. 303, 263 A.2d 390; *Dow Corning Corporation v. Capitol Aviation, Inc.*, 7 Cir., 411 F.2d 622, 626, 627; *Bakal v. Burroughs Corp.*, 74 Misc.2d 202, 343 N.Y.S.2d 541, 544.) In the instant case, it is true, K. C. Steel's liability for damages was severely limited by the exculpatory clause, but the same limitation was included in a prior contractual arrangement between the same parties

9

and was inserted by Barcus itself in the present purchase order. Accordingly, both parties were familiar with the contents of the clause — it was, in fact, no stranger to either one.

The policy of the law in general is to permit mentally competent parties to arrange their own contracts and fashion their own remedies where no fraud or overreaching is practical. Contracts freely arrived at and fairly made are favorites of the law. (*Kansas Power & Light Co. v. Mobil Oil Co.*, 198 Kan. 556, 426 P.2d 60.) None of the parties here involved were neophytes or babes in the brambles of the business world. Both companies, it would appear, dealt in projects involving considerable sums of money; both operated substantial business enterprises; and there is no suggestion that their businesses were not capably managed and profitably operated. The trial court did not find the limitation on damages imposed by the exculpatory clause was unconscionable, and we cannot view it as such. The limitation imposed was not total and was agreed upon by parties standing on equal footing.

217 Kan. at 94-95 (emphasis in original).

Mohawk argues that *Kansas City Structural Steel* is distinguishable on the facts, and further stresses that such contracts should be strictly construed. *See U.S. Indus. Inc. v. Blake Constr. Co.* 671 F.2d 539, 544 (D. C. 1982). The court finds that *Kansas City Structural Steel* is applicable, and, as noted in that case, even if exculpatory to one party, such "contracts freely arrived at and fairly made are favorites of the law." 217 Kan. at 95. While there are some factual differences between that case and the present one, they do not affect the fundamental rule there recognized by the Kansas Supreme Court. Kansas law clearly recognizes that agreements limiting liability are valid and enforceable so long as they were "fairly and knowingly entered into and if not in violation of other provisions of law." *Corral v. Rollins Protective Services Co.*, 240 Kan. 678, 693, 732 P.2d 1260, 1271 (1987). The no-damages-for-delay clause is valid and enforceable under Kansas law.

Mohawk argues that, even if the clause is valid as a general matter, it should not bar its delay claims for a variety of reasons. Thus, Mohawk cites numerous cases from across the country which have declined to apply a no-damages-for-delay clause for a variety of reasons. Mohawk argues that Law waived enforcement of the clause, that it consented to a modification of the contract so that such claims could be advanced, that it should be estopped from enforcing the clause, that the delays were caused by the "active interference" of Law, that the delays were caused by a fundamental breach of the contract by Law, and that is damages are not really "delay damages."

However, most of these theories are simply not a part of the case.  In the Pretrial Order, Mohawk identified only two issues with respect to the application of the no-damages-for-delay clause:

> Did Law's actions and/or inactions during the course of the Project act as a waiver to certain Subcontract provisions upon which Law relies in defense of Mohawk's claims?

> Is Law estopped from relying upon certain Subcontract provisions and defenses against Mohawk's claims as a result of its actions and/or inactions at the Project?

(Dkt. No. 41, at 14-15).  The attempt to raise new issues for the first time in response to Law's Motion for Summary Judgment is improper, since the Pretrial Order is binding and frames the issues in the case.  *Hulman v. Board of Trustees*, 732 F.Supp. 91, 93 (D. Kan. 1990).  Accordingly, the new issues which Mohawk now seeks to raise in its attempt to defeat the application of the clause are excluded from the case, and the court will turn to the issues of waiver and estoppel.

The court finds neither waiver nor estoppel a bar to the enforcement of the no-damages-for-delay clause.  Mohawk argues that during the delay, it repeatedly emphasized to Law that the delay was causing significant costs to Mohawk.  In anticipation of the waiver argument, Law argues in its motion that no waiver can exist under the contract, which explicitly provides that no modifications to the contract will be permitted except as agreed to in writing by the parties.  Under Section 27 of the contract, the contract as a whole could not be amended, altered, modified or terminated except by the written agreement of the parties.  Thus, the contract could only be modified by a written agreement, not by oral agreements or by any course of conduct.  In support of its argument, Law noted that such agreements are expressly contemplated in K.S.A. 84-2-209(2), which provides that a signed agreement which excludes modification or rescission except by a signed writing cannot be otherwise modified or rescinded ...." *See DP-Tek, Inc. v. AT&T Global Information Solutions Company*, 891 F.Supp. 1510 (D. Kan. 1995), aff'd, 100 F.3d 828 (10th Cir. 1996) (applying 84-2-209(2).

Mohawk argues in its response that Law waived enforcement of the damages clause, and that Law's citation to provisions in the UCC are not on point, since the present contract is predominantly

a service contract rather than a contract for the sale of goods.  However, even if the court were to conclude that the agreement is not governed by the UCC, this does not render Section 27 invalid; it means only the provision is not supported by the express authorization of § 84-2-209(2).  Mohawk has failed to demonstrate that such an agreement to prohibit oral modifications is valid *only* for contract governed by the UCC.  As with the no-damages-for-delay clause itself, the court finds no reason not to enforce a provision in a contract (whether primarily one for goods or for services) to which the parties voluntarily agreed without reservation.

Further, even in the absence of Section 27, the common law generally requires consideration for modifications to a written contract.  *Byers v. Transp. Co. v. Fourth Nat'l Bank & Trust*, 333 F.2d 822, 826 (10th Cir. 1964).  Kansas courts have repeatedly emphasized the need for additional consideration before enforcing oral modifications of prior written agreements.  *See Augusta Med. Complex v. Blue Cross*,  227 Kan. 469, 608 P.2d 890 (1980); *Hummel v. Wichita Federal Sav. & Loan Ass'n*, 190 Kan. 43, 372 P.2d 67 (1962). Merely doing what one is already obligated to do is not consideration under Kansas law.  *Apperson v. Security State Bank*, 215 Kan. 724, 528 P.2d 1211, 1219 (1974). Mohawk has failed to identify any consideration for such an agreement to modify or suspend any portion of the contract.  Mohawk offered nothing in exchange for the purported agreement which it was not already obligated to provide under the original contract.

Finally, even if the contract permitted such oral modification and even if Law received consideration for such an agreement, the court finds that waiver would not be established on the facts cited by Mohawk.  These involve mere generalities, such as alleged statements by Law personnel, in response to Mohawk's complaints, that Mohawk would be "taken care of."  The court finds that such ambiguous statements do not meet the requirement of demonstrating clearly the nature of a putative oral modification to a written contract.  *See Kers & Co. v. ATC Communications Group*, 9 F.Supp. 2d 1267, 1272 (D. Kan. 1998) (applying Delaware law).

Mohawk's estoppel argument is similarly flawed.  It contends, in a  purely conclusory fashion,  that Law should be estopped from relying on the no-damages-for-delay clause, since it

relied on Law's actions and representations to its detriment.  But the argument is in error since Mohawk has failed to show any real change in its position.  *PMA Group v. Trotter*, 281 Kan. 1344, 1352, 135 P.2d 1244 (2006).  That is, Mohawk was already obliged to perform under the contract, and was obliged to do so without seeking any additional damages, its remedy being restricted solely to extensions of time for performance.  Thus, Mohawk incurred no additional detriment which would support a claim for estoppel.

In the present case, the contractual provision restricting subcontractor remedies is very broad, and effectively excludes most[1] of the damages sought here by Mohawk, even though the defendant attempts to characterize these as not "pure delay damages."  Under Sections 3.1 and 3.5, the subcontractor is restricted in its compensation for delays to revisions to the schedule only.  Section 4.4 expressly provides that in the event of delay, schedule extension is the "*sole remedy*" of the subcontractor in the event of delay.  An action for damages — however those damages are described or denominated — is a remedy which is not permitted under the contract.

The court also finds that Mohawk's claims are subject to dismissal for the independent reason that most of those claims are not any claims for damages to Mohawk, but an attempt to recover for damages to Viking, Mohawk's subcontractor. Mohawk's own expert stated in his deposition that "in reality, most of the damages" claimed by his client "are associated with Viking." (DeSalvo dep. at 32). He further agreed  with the proposition that, except for overhead and profit, Mohawk's purported damages are "all Viking."  (Id.)[2]

As the actual injuries were those incurred by Viking rather than Mohawk, Mohawk cannot recover them here.  *Smith v. Vigortone Ag Products, Inc.*, No. 85-4534-R,  1191 WL 230686, (D. Kan. June 26, 1991), *aff'd*, 192 WL 314080 (10th Cir. Oct. 22, 1992). Because the only damages

---

[1] The exception is the $11,882 claim for the unpaid change order advanced in the Pretrial Order, (Dkt. No. 41, at 9).

[2] Mohawk does not advance any claim for overhead or profits in the action.

sought by Mohawk are damages that were actually incurred by Viking, Mohawk's counterclaim should be dismissed and judgment entered in Law's favor on its request for declaratory relief.

In its response, Mohawk states that Viking had a direct contract relationship with only Mohawk, and so cannot proceed directly against Law. It further states that "[i]t is understood between Viking and Mohawk that Mohawk will pass on to Viking a significant portion of any recovery from Law." (Resp. at 51). It also now asserts that there are significant damages not associated with Viking, specifically citing a claim for $144,100.00 in extended equipment costs related to the delay in the project.

The present action is not the sole means by which Viking might vindicate its interests. The Kansas Court of Appeals has upheld the use of liquidation and pass-through agreements as a means for a subcontractor to proceed directly against an owner and so "avoid an extra layer of litigation." *Roof-Techs International v. State of Kansas*, 30 Kan.App.2d 1184, 57 P.3d 538 (2002), rev. denied, 275 Kan. 965 (2003). Here, the pleadings indicate at best an informal expectancy for Viking to receive some of what Mohawk might recover. No formal agreement is alleged. The court finds Mohawk lacks standing to advance Viking's claims for damages.

Further, the response's attempt to identify new additional damages in the form of the equipment rental charges cannot be upheld. The new alleged damages directly contradict the clear testimony of DeSalvo, that Mohawk's damages were "all Viking." DeSalvo was Mohawk's expert and Rule 30(b)(6) designated witness, and no justification exists for the eleventh hour attempt to contradict his testimony.

Finally, as Law notes in its reply, the current statement by Kowcheck directly contradicts the earlier sworn statement by Mohawk in the Certificate of Payment that all of Mohawk's contractors have been fully paid, and that no contractor has any claim against it, which it used to obtain payment from Law. Specifically, Mohawk represented that "all persons or entities from whom Subcontractor obtained labor, materials or equipment for the Project have been paid in full and no such person or entity has any claim or lien against the Project for work performed on the Project, or labor, materials,

14

or equipment supplied for the Project." (Mohawk Dep. Exh. 23).  The court finds that in light of this representation Mohawk is now estopped from asserting otherwise.  *See Crane Co. v. Park Const. Co.*, 247 N.E.2d 591 (Mass. 1969) (applying estoppel based on subcontractor's certificate of payment).

IT IS ACCORDINGLY ORDERED, this 10th day of December, 2007, that the plaintiff's Motion for Summary Judgment (Dkt. No. 42) is hereby granted as provided herein.

s/ J. Thomas Marten
J. THOMAS MARTEN, JUDGE