IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

THE LAW COMPANY, INC.,
A Kansas Corporation,

        Plaintiff,

        vs.                 Case No. 06-1043-JTM

MOHAWK CONSTRUCTION AND
SUPPLY COMPANY, INC.,
A Pennsylvania Corporation,

        Defendant.

MEMORANDUM AND ORDER

This matter is before the court on The Law Company, Inc.'s motion for summary judgment, seeking dismissal of most of the damages defendant Mohawk Construction and Supply Company seeks in its Counter-claim.

The court previously granted plaintiff's motion in an Order (Dkt. 54) which excluded much of the evidence presented by Mohawk in its Opposition to the motion. The Court of Appeals reversed this decision, and remanded the matter for further proceedings. *Law Co. v. Mohawk Constr. & Supply*, 577 F.3d 1164 (2009). In its Supplemental Brief submitted to this court, Law has stated that it "will not object to the Court's consideration of all the exhibits attached to Mohawk's response, or to the affidavits of Cybulski or Kowcheck." (Dkt. 72, at 6).

*Findings of Fact*

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party. *McKenzie v. Mercy Hospital*, 854 F.2d 365, 367 (10th Cir. 1988). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Ellis v. El Paso Natural Gas Co.*, 754 F.2d 884, 885 (10th Cir. 1985). The moving party need not disprove plaintiff's claim; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir. 1987).

In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a **genuine issue for trial**.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis in *Matsushita*). One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

On May 8, 2003, The Law Company, Inc. entered into a contract with Cessna Aircraft Company in which Law agreed to build a Cessna C-10 Citation Service Center in Wichita, Kansas. The original contract was for the sum of $44,854,000. The work consisted of approximately 458,000

square feet with an office area, commonly referred to as "Building D," along with five aircraft service center hangars, commonly referred to as Buildings A and C, on the south side of Building D, and Buildings E, F and G on the north side on Building D.

The work was to be completed within 540 calendar days, *i.e.*, November 3, 2004. The contract provided for liquidated damages payable to Cessna in the amount of $5,000.00 for every day the project was late. Article 4.3 of the Cessna Contract stated:

> Extension of time shall be the Contractor's sole remedy for delay unless the same shall have been caused by Cessna's intentional interference with the Contractor's performance of the work, and then only after the Contractor's notice to Cessna of such interference. Changes in the scope of work, suspension of the work, and correction of defective work shall not be construed as intentional interference with the Contractor's performance.

On or about May 13, 2003, Law entered into a subcontract with Steel Service Corporation, in which Steel Service agreed to fabricate and erect the structural and miscellaneous steel, metal deck, and bar joists for the project. The contract provided that erection of structural steel would begin in mid-August 2003 and would be substantially complete within four months, or by Christmas 2003. The parties agreed that erection would start in Building D and then proceed essentially simultaneously in both hangar bay wings (north and south of Building D).

On or about May 21, 2003, Law and Mohawk entered into a subcontract in which Mohawk agreed to install all metal wall panels, interior liner panels, hangar doors, draft stops, and exterior enclosure fences on the project.

Section 3 of the Mohawk Subcontract contained the following provisions:

> 3.1 Contractor shall prepare the construction Schedule for the Project and revise the Schedule as work progresses to achieve the earliest possible completion of the Project. Subcontractor shall immediately furnish all information pertaining to the Subcontract Work requested by Contractor for implementation and revision of the Schedule. Subcontractor recognizes that revisions will be made to the Schedule and agrees to comply with such revisions without additional compensation. Subcontractor shall attend all on-site Project meetings regularly scheduled, or specially called by Contractor's project manager or superintendent with not less than three (3) days' written, facsimile or telephoned notice to Subcontractor. In the event of the absence of Subcontractor at any such Project meeting, Subcontractor shall be bound by any decisions or directives issued by Contractor at such meeting concerning the Schedule and/or the progress of the Project.

. . . .

3.3 No extension of time for performance of the Subcontract Work shall be claimed by Subcontractor, or allowed to it, unless Subcontractor shall have submitted a written request to Contractor within two (2) days after occurrence of the cause of such request and unless (I) Owner grants Contractor an extension of the Project substantial or final completion date for said occurrence or (ii) Contractor and Subcontractor have otherwise agreed in writing as to the amount of additional time allowed. It is understood that delays in Subcontractor's performance which occur by reason of its inability to secure timely delivery of materials, equipment, or sufficient manpower shall not constitute grounds for an extension of time under this Subcontract. In the event Contractor is liable for liquidated or other damages by reason of late completion of the Project, Contractor may assess against Subcontractor that portion of said damages attributable to any delay by Subcontractor.

. . . .

3.5 Subcontractor agrees to make no claims against Contractor or Owner should the Schedule not be strictly adhered to, it being understood that Contractor will endeavor to expedite completion of the Project as rapidly as possible.

Citing the deposition testimony of Mark Cybulski, Law submits as a fact that Mohawk does not contend that Law intentionally interfered with its work. (Cybulski Dep. at 41-43). In its Response, however, Mohawk states that it does allege that Law "either through its actions or inactions, intentionally or actively interfered" with Mohawk's performance, and that the other subcontractors "intentionally or actively interfered," and references a list of over a dozen paragraphs from its supplemental statement of facts.(Dkt. 46 at 3, ¶ 7, citing SSOF ¶¶ 32-37, 40-41, 50-51, 55-56, 67, 93, 97). The cited facts, however, fail to supply any evidence that Law intentionally sought to interfere in Mohawk's completion of the project.

The Mohawk Subcontract contains certain Supplementary Conditions which are "intended to adapt the Base Agreement to this specific Project." Section 4.4 of the Subcontracts Supplementary Conditions provides as follows:

Subcontractor specifically acknowledges that *extension of time shall be Subcontractor's sole remedy for delay unless the same shall have been caused by Owner's or Contractor's intentional interference with the Subcontract Work*, and then only after Subcontractor has provided timely notice to Contractor and Owner has approved such request for extension. In accordance with Subparagraph 4.3 of the General Contract, changes in the scope of the Subcontract Work, suspension of the Subcontract Work, and correction of defective Subcontract Work shall not be construed as intentional interference with Subcontractor's performance.

(Emphasis added). Mohawk objects to this requested finding of fact as being merely the interpretation of counsel, but the language cited above, including the statement of intent, is accurately quoted from the Subcontract.

Section 27 of the Mohawk Subcontract provides as follows:

Entirety of Subcontract. This Subcontract, Schedule A and Schedule B, and the provisions thereof, represent the entire agreement of the parties as to the Subcontract Work to be performed by Subcontractor and may not be amended, altered, modified or terminated (except as provided in §11.) except by the written agreement of the parties. In the event of any conflict between any of the Contract Documents and the provisions of this Subcontract (including Schedule A and Schedule B), the latter shall prevail.

Mark Cybulski was Mohawk's project manager for this job. He read the Mohawk Subcontract before he executed it. He has executed hundreds of agreements of this type. He read the sentence in Section paragraph 3.1 of the Mohawk Subcontract, which states: "Subcontractor recognizes that revisions will be made to the schedule and agrees to comply with such revisions without additional compensation." Cybulski testified that is what actually happened on this job because, "We were supposed to start in September and when I was at the job site and we got an official schedule at that time we saw that we couldn't start in September. And I made up a schedule for our work based on that job site meeting. So that meant to me that since the job was pushed back that it was just the way it was going to be." (Cybulski Dep at 22-23) He agreed the he "knew in August that we weren't going to be able to start in September." (*Id*. at 23).

The Mohawk Subcontract provided that installation was currently scheduled to commence in early September 2003 and that the overall wall panel installation would be completed in 48 working days.

The steel erection for the project was delayed. The reasons for these delays are disputed. Steel erection on this job, as on all jobs of this type, was on the critical path. In other words, most other work on the project could not commence in certain areas until the steel was erected. This included installation of the metal wall panels. Mohawk alleges that this delay occurred because of Law's failure to properly manage its subcontractors.

Mohawk contracted with Viking Erectors Corp. to perform all labor necessary to fulfill Mohawk's duties under Mohawk Subcontract. It did so through a written purchase order which called for a fixed price payment to Viking of $550,000. Change orders were later issued to add $60,000-$70,000 to the Viking labor purchase order.

Although the shareholders of Viking are also the shareholders of Mohawk, Viking is not a subsidiary of Mohawk. Viking is a separate corporation with its own tax identification number.

Mike Parker is an employee of Viking. He has never been an employee of Mohawk. He served as Viking's representative on the project.

On April 10, 2003, Doug Kimple of Law acknowledged that Law would perform its construction services at the project in eighteen months. On April 29, 2003, Law reiterated to the Cessna representative, McCluggage Van Sickle & Perry ("MVP"), that work would be completed in eighteen months. In its Reply, Law notes that the time for construction was controlled by the Cessna contact, which specified 540 days.

As early as July 18, 2003, Law recognized that the actions and inactions of Steel Service were going to "create potential and very costly delay to this project." Early in the project, Law advised Steel Service that it was "now in a position of extreme urgency." (Def. Exh. 3).

In August of 2003, more than two months before Mohawk began its work on the project, Steel Service delayed the start of steel erection at the project. On September 12, 2003, Steel Service acknowledged that it was experiencing startup problems resulting in lost time. During the same month, MVP expressed its concern over the number and timing of submissions from Steel Service.

On September 18, 2003, Law advised Steel Service that its "fabrication errors have severely impacted the schedule and the ability of subsequent trades to commence work" and that Law was "in the midst of many serious problems and further yet potentially serious problems." (Def. Exh. 7).

Throughout September, 2003, Steel Service's steel deliveries, or lack thereof, continued to delay construction. Law advised Steel Service that "these very serious problems will create costs for which we will hold [Steel Service] responsible." (Def. Exh. 8).

On October 7, 2003, Law again notified Steel Service of the significant impact caused by its fabrication and delivery failures. Specifically, Law advised Steel Service that its "continued failure to meet required completion dates is impacting other trades. We will hold [Steel Service] fully responsible for all such impact." (Def. Exh. 9). On October 22, 2003, Law notified Steel Service that "this project is in a serious schedule situation." (Def. Exh. 10).

When Mohawk arrived at the project in late October, 2003, it was apparent that there were severe delays in the initial project schedule and that Mohawk would not have access to the project site as provided for in the parties' Subcontract. Mohawk wrote to Law on October 29, 2003 that "[a]ny delays will require additional compensation." (Def. Exh. 12).

Law provided no response to Mohawk's October 29, 2003 letter, and never indicated that Mohawk would not be compensated for the delays caused by Law or SSC. Law also failed to raise any contractual provisions in response or as a defense to Mohawk's notice of claim for additional compensation, nor did it indicate that Mohawk would only be entitled to an extension of time to complete its work at the project.

In connection with the steel fabrication and delivery delays, Mohawk notified Law on October 31, 2003 that the protective coating on the wall panels could be detrimentally impacted if they were stored on site for too long a time.

In early November, 2003, there were still problems and delays with respect to the steel trusses. Some of the delays were caused, in part, because of a payment dispute between Steel Service and its subcontractor, PKM Steel Services, Inc.

Viking personnel came to the job site on November 7, 2003. Viking employees recorded their time thereafter. At no time did Mohawk advise Law that Viking employees were actually doing the erection of the metal panels. Mohawk never gave a copy of its purchase order with Viking to Law. Cybulski testified, "I had a contract with a customer, and because my labor, they don't need to see my labor." (Cybulski Dep. at 82).

In mid-November, 2003, Law was aware that the project was behind schedule due to the delays in steel fabrication and delivery. Moreover, Law acknowledged that the steel problems were affecting the work of other contractors, including Mohawk, and that those contractors would be seeking additional costs as a result. Law notified Steel Service that:

> Obviously, all subsequent work is impacted by delayed steel completion on a per area basis. The overall effect includes compression, re-sequencing, out-of-sequence work, etc. on subsequent activities. To fully quantify the monetary effect at this time would most likely inflate its effect. As such, we feel it is in your best interest if we proceed with the understanding that [Steel Service] will be notified when these costs become available in the future rather than attempting to fully quantify at this time.

> Per our 11/12/03 conversation, we are working with the masonry and wall panel subcontractors [Mohawk] to see how much of the delay they can help to overcome and the costs for these efforts. The 10/29/03 steel schedule information was provided to our Wall Panel subcontractor [Mohawk]. They have advised that the on-site panels have a fixed storage time after which they must be unbundled or the protective wrap will stick to the panels. If the building is not available for installation the un-bundling becomes an additional effort/cost created by steel delays.

(Def. Exh. 15).

Kowcheck testified that the total amount Mohawk owed to Viking on the project is $622,000. Mohawk has paid Viking $617,000, and owes it another $5,000.

On November 18, 2003, Mohawk again notified Law that it did not have access to the project and was unable to perform its obligations pursuant to the parties' Subcontract. Mohawk also stated that it did not intend to increase manpower or work overtime to make up the delays without additional compensation.

Cybulski has averred that Doug Kimple of Law repeatedly told him that Steel Service would be held accountable for any and all additional costs incurred by Mohawk as a result of the delays. According to Cybulski, Mohawk relied on these representations – that it would be compensated for any and all additional costs at the project resulting from Law's breaches, delays, inefficiencies, out-of-sequence work and other schedule impacts – by continuing to perform its contractual obligations in good faith.

On November 20, 2003, Law again notified Steel Service that Mohawk and other subcontractors would be required to perform overtime work as a result of the steel delays. Law also

notified Steel Service that it would be held accountable for these costs. By a separate fax the same day, Law advixed Steel Service that tube steel had still not been delivered in the office area of the project, which was preventing many of its subcontractors, including Mohawk, from commencing their work. Law also recognized that "[t]his is a critical impact to the project," which was already two months behind schedule. (Def. Exh. 18).

On December 2, 2003, Law's concerns with respect to the steel truss deliveries continued, and it expressed its frustration with Steel Service. Law notified Steel Service that "we must again advise that we will hold [Steel Service] fully responsible for all costs created by these ongoing delays." (Def. Exh. 19).

The same day, Law wrote to Mohawk, acknowledging the significant impact on the schedule, noting "[a]gain, I agree the [sic] will be some additional costs and we will be fair about this." (Def. Exh. 20).

On December 5, 2003, Mark Cybulski of Mohawk notified Law that various areas of the job were in a condition such that Mohawk could not commence work.

On December 11, 2003, Law once again notified Steel Service that its failure to timely perform at the project had adversely affected other trades. Law also advised Steel Service that it was authorizing Mohawk to alleviate some of the delays and schedule impacts caused by Steel Service by working all available overtime during the installation of the wall panels to "help mitigate some of the impact created by [Steel Service] and we will deduct all costs for same from future sums due [Steel Service]." (Def. Exh. 21).

On December 24, 2003, Law wrote to MVP that "certainly we are not happy with the ongoing steel issues." Law stated that the problems started with a conflict on the contract documents, and that "there have been other contract document issues which play into this matter." (Def. Exh. 22).

On January 22, 2004, MVP responded to Law, stating: "There are too many outstanding steel deficiencies. Please advise on what action you are taking to regain quality control on structural issues." (Def. Exh. 23).

On January 23, 2004, Law advised Steel Service that "this is a very serious situation" and threatened to "get directly involved." Law wrote that "all costs for this effort will be the sole responsibility of [Steel Service]." (Def. Exh. 24).

On February 20, 2004, Mohawk notified Law that many of the areas were still not completed in a manner which would allow Mohawk to complete its performance under the parties' Subcontract. Mohawk also advised Law that "we are hereby giving notice that we may prepare a schedule extension claim for the duration of now to the end of the project." (Def. Exh. 25). In response, Law did not advise Mohawk that it would not be entitled to any additional compensation, and was instead limited to receiving an extension of time.

According to Cybulski, although one of Mohawk's suppliers was late in shipping some of its materials, these late deliveries had no impact upon the schedule. Even if timely delivered, Mohawk could not have used them because Law was not providing access to the project site. The materials would have been placed in outdoor storage at the site, with the possibility of damage from that storage.

Cybulski also avers that, throughout the project, Law repeatedly acknowledged that the delays and out-of-sequence work were attributable to Steel Service and Steel Service's subcontractors. Law contends that Cybulski testified differently in his deposition. In his deposition, Cybulski specifically denied any recall of verbal communications between he and Doug Kimple of Law after August 5, 2004, other than one involving the location of a fax. (Cybulski. Dep. at 110-11). Before that date, Cybulski first testified that Mohawk was not getting any response on the claim:

Q. Any other discussions, then with Mr. Kimple on this claim issue?

A. Well, we had asked why we weren't getting any response to this, because we really didn't get any kind of response for the longest time, and then Doug had said that he sent us a fax, and, well, I did see a fax, but that didn't seem like a formal request to me, because it was a lot of questions and there were some

items on there that just said, per all of my items, we're looking into this – I'm paraphrasing now – we're looking into this, we disagree with the amount, yes, we think this is okay, we disagree, similar to that. But that didn't seem like a formal response to my claim, so I basically pushed it aside.

Q.   Any other discussions, any other comments, statements by Mr. Kimple on this subject? I want to cover everything that you can recall. If you don't recall, that's fine.

A.   I don't recall.

(*Id*. at 105-06). However, Cybulski later testified:

A.   I don't recall the discussion that we've had, but I know on more than one occasion that it was brought up to us that all of these concerns that we had about us not getting our work in a timely manner would be taken care of.

Q.   Do you recall the words he used? "Taken care of," is that your word?

A.   That's my word, I guess, yeah.

Q.   And —

A.   I can't really quote it this time.

Q.   And I appreciate that, after three years, but this is my opportunity to find out what you're going to say about what Mr. Kimple told you in regard to any claims you were proposing, and so —

A.   I did not ever, at no time were we ever told that we would not get paid for our extension of the schedule.

Q.   Were you ever told that you would definitely get paid?

A.   Yes.

Q.   And Mr. Kimple told you you would get paid?

A.   Yes.

(*Id*. at 107-08).

MVP recognized that "the work delays were a result of delays in steel fabrication, steel delivery to the Project Site, steel erection and correction of steel fabrication and erection deficiencies. Steel fabrication, delivery and erection delays in turn created additional installation delay in roof decking, roofing, glazing and exterior wall panels." (Def. Exh. 26).

During the February 26, 2004 project meeting, Law indicated "that steel delays and not getting the building enclosed and weather tight before the cold and wet weather set in contributed to roofing, glazing and wall panel delays." (Def. Exh. 26).

As of March 24, 2004, many of Steel Service's "fixes" were already up to six months late. (Def. Exh. 27).

Once Mohawk was given access to perform its work, it was at times required to perform do so out-of-sequence and inefficiently.

Mohawk has alleged that, when the steel materials finally were delivered to the project, Law and its subcontractors did not perform the erection in a quality manner and pursuant to the contract documents and drawings which, consequently, forced it to perform its work in an inefficient and out-of-sequence manner. Law correctly notes that the cited evidence (Def. Exh. 30) does not directly make any claim of poor quality performance by Law or another subcontractor. However, the exhibit, a letter from Cybulski to Doug Kimple of Law, states that Mohawk has not attached some panels "due to the lack of support," caused by the failure to install studs called for in project detail drawings. That specific failure – "like many other conditions" – was causing Mohawk to delay its work.

Mohawk cites Cybulski's letter of May 20, 2004 to Kimple as indicating that many of the areas requiring panel installation were still not ready, and as stating that it would demobilize until the project was accessible for Mohawk's work. (Def. Exh. 31). According to Law, the letter actually indicates that Mohawk was waiting for additional deliveries from its supplier, Benchmark. This is partially correct. Cybulski wrote that "[w]e cannot finish the horizontal panels until the replacements arrive from Benchmark," but he also wrote that the installation of "vertical panels [required] completion of studwork at the expansion joints," and also notes "other areas that are not ready for panel installation." (*Id*). The letter suggests that these "other areas" were not the responsibility of Mohawk or its suppliers.

In late May, 2004, Law again told Steel Service that its deficient work was holding up Mohawk's progress.

On July 14, 2004, MVP notified Law that several structural steel details, erection deficiencies and unknown inspection results required remedial action and inspection verification.

On July 22, 2004, Mohawk notified Law that it had to remove or replace numerous wall panels because of damage caused by Law or its other subcontractors.

According to Cybulski, most, if not all, of the Benchmark deliveries during the summer months of 2004 were not materials required under the original scope of Mohawk's contract with Law. Instead, the deliveries were for replacement materials damaged by Law or other Law subcontractors at the project.

On August 5, 2004, Mohawk provided Law a detailed breakdown of its costs at the project resulting from the delays, schedule impacts, inefficiencies, and out-of-sequence work caused by Law. According to Cybulski, Law always acknowledged not only that Mohawk was entitled to additional compensation as a result of those problems, but that Mohawk would be paid these costs. The letter stated: "Since the onset of the construction of the project, we have been experiencing major delays and schedule changes which are having a significant cost impact on our total scope of work. Since the causes of these delays and changes are definitely not attributable to Mohawk, we feel justified in submitting this request for reimbursement of these costs." The letter went on to set forth damages in various categories and made a total claim of $233,047. (Plf. Exh. I)

In its August 5, 2004, claim letter, Mohawk sought damages for "wage escalation." This refers to the increased cost to Viking for the wage escalation at the union. The letter's claim for "foreman costs" all relate to Viking's Parker. (Def. Dep. Exh. 20). The August 5 claim letter cites damages arising from delays and schedule changes: "we have been experiencing major delays and schedule changes which are having a significant cost impact on our total scope of work." (*Id.*)

13

On August 17, 2004, Law again notified Steel Service that its work at the project was "[u]nbelievably" still not complete. Furthermore, "this delayed completion of your contract work is made much more difficult by the ongoing work of the other trades and continues to impact other trades." (Def. Exh. 36).

On August 20, 2004, Law responded to Mohawk's August 5, 2004 letter. Once again, Law did not advise Mohawk it was not entitled to additional compensation for many of the items cited in Mohawk's letter. Instead, Law disputed the amount of time Mohawk claimed it was delayed at the project. Law makes no mention of, nor does it rely upon, any of the exculpatory provisions contained in the Subcontract.

Cybulski has averred that, based upon this letter and his numerous discussions with Law, Mohawk believed that it would be compensated for its costs resulting from delays, schedule impacts, out-of-sequence work, inefficiencies, and other problems Law or other subcontractors caused. At no time prior to the present litigation did Law ever reference or rely upon the alleged exculpatory provisions in the parties' Subcontract as a defense to any of Mohawk's claims for additional compensation.

Shortly after receiving Mohawk's August 5, 2004 letter, Law notified Steel Service that it intended to made a deduction from the payment to Steel Service to cover certain costs incurred by Mohawk as a result of the delays.

As of September 30, 2004, there remained certain items still not delivered or completed by Steel Service at the project which, in some instances, were over nine months late.

Steel Service disputed that it was directly responsible for all of the project delays, impacts, and inefficiencies, and wrote to Law on October 14, 2004 that "we are doing everything possible to limit the delay caused by the Law Company and/or incorrect contract documents." (Def. Exh. 40).

On November 4, 2004, Law notified Steel Service that its "lack of performance" had caused significant costs to the project's subcontractors. The letter noted that "**The Exterior Wall Panel subcontractor (Mohawk)** has incurred additional costs as indicated in the attached 8/5/04 letter

from Mohawk Construction." (Def. Exh. 41) (emphasis in original). Law also indicated that it expected additional costs to be incurred as a result of Steel Service's lack of performance, and that it was issuing a deductive change order in the amount of $879,418.00, which included Mohawk's claim.

In November 2004, Mohawk advised Law that its work was complete. In a letter dated November 17, 2004, Mohawk sent Law a revised claim letter, which included damages resulting from an additional one month on the project. Mohawk added another month of alleged delay to its claims, increasing its total damage claim to $255,753.

Law did not respond in writing to this letter. According to Cybulski, however, and as noted above Law verbally represented at all times that Mohawk would be entitled to additional compensation for its costs and damages. Based upon these representations, Mohawk remained on the project

As late as December 22, 2004, MVP told Law that "we are concerned with the overall progress of the Project." (Def. Exh. 43). As of January 13, 2005, there remained unresolved structural steel fabrication and erection issues.

According to Cybulski, at no time throughout the project did Law indicate to him that the delays were caused by Mohawk; instead, Law placed the blame on Steel Service and PKM. As an illustration, Shelly Electric, Inc., another Law subcontractor, understood and agreed that the project's schedule was "greatly affected by the delays caused by the structural steel provider/erector [PKM/Steel Service]." (Def. Exh. 45).

On February 22, 2005, Law sent Steel Service a follow-up letter to its November 4, 2004 letter. Law notified Steel Service of Mohawk's revised November 17, 2004 claim, and stated, "we do not know if PKM was the sole source of the truss delay and quite frankly that is the business and obligation of Steel Service." (Def. Exh. 46). Further, Law notified Steel Service that it

was several months late in Area 'D' preventing the metal studs from proceeding which later delayed the wall panels. It started with Steel Service. The steel framing at the canopies was not properly completed until the third quarter of 2004 which in

> itself is over (6) months late, not to mention, the many other locations where Steel
> Service's failures delayed the wall panel installation and/or completion.

(*Id*.) Finally, Law wrote that it was issuing a deductive change order in the amount of $1,193,040.00 as a result of the problems, delays, impacts, and inefficiencies caused by Steel Service at the project, which included Mohawk's damages.

On June 9, 2005, Law advised Mohawk that, with respect to Mohawk's November 17, 2004 letter, "we are pursuing with responsible parties to the extent we can." (Def. Exh. 47). Again, Law never notified Mohawk that it was not entitled to additional compensation as a result of any exculpatory provision contained in the parties' Subcontract.

Mohawk's Mark Cybulski notified Law on numerous occasions that Mohawk could not work in specific areas and requested a revised schedule from Law. Law, however, never did so. Cybulski's understanding of the phrase "strictly adhered to" contained in Section 3.5 of the parties' Subcontract "doesn't mean that we're going to slip eight months on this project. Strictly adhered to or not strictly adhered to would only mean that you might have a couple of days lapse in some things. You don't have eight months that goes by." (Def. Exh. 48 at 36). Mark Cybulski's understanding of a "delay" as that term is used in Paragraph 4.4 of the Supplementary Conditions to the parties' Subcontract is "a couple of days, an extension of time for a delay which is just – what we had wasn't something that was a delay to where we could make up a day or so here. We got pushed back eight months where we couldn't finish this job. That, to me, doesn't constitute a delay." (*Id*. at 38).

Mohawk alleges that Law's Doug Kimple told Cybulski on numerous occasions that Mohawk would be compensated for the project delays, inefficiencies, out-of-sequence work, and schedule impacts. He also advised Mohawk that Mohawk was not simply receiving an extension of time to perform its work. Cybulski has stated that throughout the entire course of the project, and even after Law was notified of Mohawk's claims, the exculpatory provisions contained in the parties' Subcontract were never brought up or raised by Law, and Law never advised Mohawk that it was only entitled to an extension of time to complete its work. Kimple always blamed all of the

problems at the project on the steel erector and supplier. Mohawk was never told that it would not get paid for the extensions. Instead, Kimple told Cybulski that Mohawk would definitely be paid.

According to Cybulski, Viking may not yet have invoiced Mohawk for the entire project. Law, however, responds by noting that there is ambiguity in the Certificate of Payment submitted by Mohawk, which directly states that all its subcontractors have been paid in full.

Law contends that Mohawk blamed another company – Alumashield – for extra time Mohawk spent on the job replacing discolored panels in September and October 2004. Mohawk made claims against Alumashield in the amount of $38,227. Law also notes that Mohawk blamed yet another company, Benchmark, for the delay in panel shipments and advised Benchmark it would pass costs on to them.

In its Response, Mohawk argues that the Benchmark delays benefitted Law by preventing the delivery of materials before they could be used, in light of other delays on the project. With respect to Alumashield, Mohawk denies the asserted fact by stating that any delays were "solely caused by Law's and Law's other subcontractors." (Dkt. 46 at 5, ¶ 23).

Law notes that Benchmark still needed to ship five panels as of August 20, 2004. According to Mohawk, these were replacements for panels damaged by Law or other subcontractors.

Mohawk is not making any claim for overtime expenses. Viking's representative, Mike Parker, believes the only overtime work by Viking was one Saturday to get out of another contractor's way.

In the Pretrial Order, Mohawk contends that its alleged damages were incurred due to "numerous Project delays, suspensions of work, out-of-sequence work, and inefficiently performed work." (Dkt. 41 at 7). As acknowledged by Mohawk in the Pretrial Order, the fifth required element of proof for its breach of contract claim against Law is "[d]amages to Mohawk caused by the breach." (*Id*. at 10). As identified in the Pretrial Order, an issue of fact in this action is "the amount of Mohawk's damages." (*Id.* at 14).

In its Notice of Rule 30(b)(6) Deposition directed to Mohawk, Law identified one topic of intended inquiry as follows:

> All contentions of Mohawk concerning the damages Mohawk claims to have suffered as a result of the alleged breach of the Law Company / Mohawk Subcontract, including Mohawk's subjective beliefs and opinions regarding the cause or causes of the damages and its monetary valuation of those damages.

(Dkt. 30 at 2). Mohawk designated its expert witness, Dominick DeSalvo, to speak on its behalf regarding its alleged damages and the causes of those alleged damages.

DeSalvo produced an expert report in which he opined that Mohawk is entitled to recover $634,403.23 in damages. With the exception of $9,919 in alleged "Rework" damages and a claim for prejudgment interest, all of the damages opined to by DeSalvo are presented as having been caused by delay or rescheduling.

DeSalvo testified that his role as Mohawk's damages expert was to calculate "[d]elay and disruption" damages. (DeSalvo Dep at 27, 30).

DeSalvo testified that it was his opinion that Mohawk suffered damages from being on the job longer than they should have been or anticipated being. However, he went on to explain that the company on the job longer was actually Viking. (*Id*. at 30-32). DeSalvo testified that all of the damages being sought by Mohawk in this action were actually allegedly suffered by Viking, with the exception of the overhead and profit Mohawk wishes to add to Viking's alleged damages. (*Id*. at 32).

DeSalvo's report is based on Cybulski's claim letters of August and November 2004. The report sets forth five categories of damages, together with overhead, profit, and interest. The first category, "labor escalation," sets forth the same amount as that claimed by Cybulski. (*Id*. at 72). The second category, "extended general foreman's costs," sets forth the same amount, $7,800 per month, as that claimed by Cybulski. However, DeSalvo used a longer period of months. (*Id*. at 72-73).

DeSalvo's third category of damages, "extended use of equipment and utilities," sets forth the same amount, $14,400 per month, as that claimed by Cybulski. DeSalvo did nothing to confirm these numbers or the math behind them. (*Id*. at 73). The fourth category of damages, "rework," is

simply a dispute between Law and Mohawk about whether extra work was done. DeSalvo is not stating an opinion on this dispute or the amount claimed. He simply included the amount.

DeSalvo's final category of damages, "loss of labor productivity," was based on Viking's cost report. He thereafter put a cost of "seasonal impact" because some of the work was done in the winter. (DeSalvo Dep at 74-77). DeSalvo also uses a 20% overhead and 10% profit figure. However, he acknowledged the Mohawk Subcontract limited overhead and profit to 5%, and admitted that his figure should be adjusted to that. (*Id*. at 104-06).

Mohawk makes only two responses to Law's Statements of Fact regarding DeSalvo's damages calculations. It generally argues that Law's requested facts are merely the argument of counsel. Second, it references several facts cited in its Supplemental Statement of Facts (SSOF ¶¶ 73-82).

The court finds that the cited grounds offer no valid basis for rejecting the requested findings of fact. The requested findings accurately summarize DeSalvo's testimony. Further, the additional facts cited by Mohawk merely buttress Mohawk's claims regarding the alleged pass through agreement. Those facts offer no rationale for permitting the defendant to disavow the testimony of its Rule 30(b)(6) expert representative as to the nature of its damages.

On January 24, 2006, Mark Cybulski, on behalf of Mohawk, executed under oath and delivered to Law Company, a certificate of payment in order to induce Law to pay to Mohawk the retainage on the Mohawk Subcontract. In that sworn statement, Mohawk made several certifications, including the following:

> (c) all persons or entities from whom Subcontractor obtained labor, materials, or equipment for the Project have been paid in full and no such person or entity has any claim or lien against the Project for work performed on the Project, or labor, materials, or equipment supplied for the Project.

The Certification further stated that Mohawk was reserving only the right to claim or recover damages incurred by Subcontractor (Mohawk) at the project. (Plf. Exh. P). According to Mohawk, that representation was intended only to cover "issues related to Mohawk's entitlement to receipt of payment for retainage." (Dkt. 46 at 9).

19

In support of its summary judgment motion, Law notes that when Cybulski was asked what facts supported the claims of waiver or estoppel, Cybulski identified only four facts: (a) He asked Kimple why there was no formal response to Mohawk's February 20, 2004, claim letter, (b) Kimple said that Mohawk's concerns about not getting its work in a timely manner would be "taken care of," (c) Kimple said that Mohawk would get paid, and (d) Kimple never told Mohawk that it would not get paid for the extension of the schedule. As noted earlier, a factual dispute exists as to Cybulski's testimony.

As identified in the Pretrial Order, among the issues of law to be decided in this action are the following:

a. Does the Subcontract language prevent Mohawk from making any delay claims against Law or any other types of claims based on adjustments to the work schedule?

b. Did Law's actions and/or inactions during the course of the Project act as a waiver of certain Subcontract provisions upon which Law relies in defense of Mohawk's claims?

c. Is Law estopped from relying upon certain Subcontract provisions and defenses against Mohawk's claims as a result of its actions and/or inactions at the Project?

(Dkt. 41 at 15).

David Kowcheck and Ray Jennings are each fifty percent (50%) shareholders in both Mohawk and Viking. Viking was used by Mohawk as a subcontractor on the project. Kowcheck has averred that Viking notified Mohawk throughout the project of the numerous project delays, schedule impacts, inefficiencies, out-of-sequence work, and suspensions of work. He has also averred that Viking has incurred significant additional costs and expenses at the project as a result of the same.

Because Jennings and Kowcheck are the sole shareholders of Viking as well as Mohawk, they decided that it was not in either company's best interest for Viking to institute a legal proceeding against Law to recover these additional costs and expenses. Moreover, because Viking's contract is with Mohawk, Viking has no contractual privity to file a legal action against the parties they believe responsible for the project's failures (*i.e.*, Law, Steel Service, and PKM). As such,

Viking has notified Mohawk of its claims and has chosen to wait for payment from Mohawk pending a resolution of Mohawk's claim against Law. Kowcheck states in his affidavit that Mohawk intends to pass down to Viking a certain portion of any proceeds recovered from Law. According to Kowcheck, in addition to the labor escalation and loss of labor productivity incurred by Viking at the project, Mohawk has also incurred other significant damages. He cites as an example, approximately $144,100.00 in extended equipment costs arising from project inefficiencies. All of the equipment utilized by Mohawk at the project was either owned by Mohawk or rented by Mohawk. According to Kowcheck's affidavit, a significant portion of Mohawk's claim does not relate to the project delays but rather costs incurred due to the project inefficiencies, out-of-sequence work, and suspensions of work.

After the project was completed, PKM filed suit in the Sedgwick County District Court of Kansas against Steel Service; PKM's state action was subsequently removed by Steel Service to the United States District Court for the District of Kansas, Docket No. 04-1299-JTM. PKM sought $349,813.93 in damages for amounts due under the subcontract; Steel Service counterclaimed alleging damages for late delivery of materials. Steel Service also filed a crossclaim against Law for an unpaid contract balance of $867,616.43. Law filed a crossclaim against Steel Service in the amount of $1,193.040.00.

As part of Law's crossclaim against Steel Service, Law allegedly "passed on" Mohawk's claims against Law as a result of the project delays, impacts, inefficiencies and out-of-sequence work. The amount of Law's crossclaim against Steel Service is the same deductive change order amount that SSC was notified of on February 22, 2005.

The PKM Action also included a third party complaint against Steel Service filed by another of its subcontractors at the project, Bosworth Steel Erectors, in the amount of $848,734.49. Bosworth claimed retainage in the amount of $216,613.80, extra work items of $168,777.08 and delay damages of $461,343.61. Steel Service subsequently increased its crossclaim against Law to $1,034,587.00.

Prior to trial in the PKM action, Steel Service and Law entered into a Settlement Agreement and Mutual General Release in which Law agreed to pay Steel Service $587,500.00 as full and final settlement of the crossclaims between the two companies, an amount $447,087.00 less than Steel Service sought from Law. The settlement amount included some out-of-pocket costs Law paid dto third parties for work originally assigned to Steel Service.

The dispute between Steel Service and PKM went to trial. Ultimately, the Court held that PKM was the responsible party for the delays in the project, and denied PKM's claims against Steel Service and entered judgment against PKM in the amount of $67,784.02, plus attorneys' fees, costs and expenses. The court further found that Steel Service had made payment to Bosworth in the amount of $180,500.00 for Bosworth's delay claims at the project.

## Conclusions of Law

### *Validity of the Exculpatory Clause*

In its Supplemental Brief, Mohawk now argues that it does not dispute "that competent parties are free to contract as they desire," and generally advances no argument against the validity of similar clauses. (Dkt. 73 at 5). This is a change from its original Opposition to the Motion for Summary Judgment, where it argued that the only Kansas case directly on point, *Kansas City Structural Steel v. L.G. Barcus & Sons*, 217 Kan 88, 535 P.2d 419 (1975), was distinguishable, and otherwise stressed that "there are various states that have refused to uphold such clauses deeming them against public policy." (Dkt. No. 46 at 31).

In its prior Order, the court held *Kansas City Structural Steel* recognized the general validity of such agreements, and further found that "[t]he no-damages-for-delay clause is valid and enforceable under Kansas law." (Dkt. No. 54 at 10). The Court of Appeals opiniondoes not address this holding, and it remains the law of the case. *See Gray v. Phillips Petroleum*, Nos. 84-2107-S,

22

84-2295-S, 1990 WL 62068, *3 (D. Kan. April 17, 1990) (district court rulings not disturbed by intervening appeal are the law of the case).

While observing that it is not challenging the theoretical validity of the "no damages for delay" clause, Mohawk does suggest in its Supplemental Brief that that clause is inconsistent with, and must be reconciled to, other provisions in the contract. Mohawk argues that Law "fails to point out other conditional language contained in the very same provisions which render the otherwise enforceable exculpatory provisions moot," (Dkt. 73 at 5), specifically referencing two contract provisions. First, Mohawk cites Subcontract Section 3.1, which provides that Law would "revise the Schedule as work progresses to achieve the earliest possible completion of the project," and the provision in Section 3.5 that "it being understood that Contractor [Law] will endeavor to expedite completion of the Project as rapidly as possible."

Mohawk raises this mootness argument for the first time in its Supplemental Brief. It made no mention at all of Section 3.1 in its original Memorandum in Opposition, and mentions Section 3.5 only in the context of its argument that Law's conduct constituted a "fundamental breach" of the contract. (Dkt. 46 at 47-48).

The court addresses the fundamental breach argument below. For present purposes, the court finds the arguments relating to mootness or contract construction are not grounds for denying summary judgment, since the cited provisions in the contract do not explicitly or implicitly limit or condition the exculpatory clause contained in Supplemental Condition Section 4.4, which explicitly provides that "extension of time shall be Subcontractor's [Mohawk's] sole remedy for delay."

The only condition or exception attached to this limitation in Supplemental Conditions Section 4.4 arises when the delay exists because of "intentional interference" by Law or Cessna. The cited language in Sections 3.1 and 3.5 create a general duty by Law to advance the completion of the project as expeditiously as possible, but those provisions do not override the clear and express waiver of an action for damages in Section 4.4.

**Exception: Fundamental Breach**

Mohawk argues that even if the "no damages for delay" clause might otherwise be enforceable, it should not apply in the present case because Law's actions represent a "fundamental breach" of the Subcontract. Mohawk cites three decisions which have recognized the doctrine of a fundamental breach as an exception to similar exculpatory clauses. *See U.S. ex rel. Evergreen Pipeline Constr. v. Merritt Meridian Constr.*, 95 F.3d 153, 167 (2nd Cir. 1996); *Forward Indus. v. Rolm of New York Corp.*, 506 N.Y.S.2d 453, 456 (N.Y. App. Div. 1986); *Gray v. City Sch. Dist. of Albany*, 716 N.Y.S.2d 795, 796 (N.Y. App. Div. 2000). As the defendant notes, the doctrine of fundamental breach is "[r]elated to the concept of active interference." (Dkt. 73 at 13).

However, after citing the relevant cases, and noting the observation in Section 3.5, that is, the parties' "underst[anding]" that Law would "endeavor to expedite completion ... as rapidly as possible," Mohawk's argument relating to fundamental breach is cursory: "If a jury determines that Law breached any of its express or implied contractual obligations, Law should not be permitted to rely upon the no damage for delay provision in the Subcontract." (Dkt. 46 at 47). That is the extent of its argument, lock, stock, and barrel. Mohawk provides no further elaboration in its Supplemental Brief, which essentially repeats verbatim the relevant passage from its earlier Opposition Memorandum. (Dkt. 73 at 13-14).

The court finds that Mohawk's "fundamental breach" argument does not prevent application of the "no damages for delay" clause. First, each case Mohawk cites in support of its argument come from a single jurisdiction. Second, note of the cited cases provides any direct indication that the doctrine of fundamental breach should be applied here.

After enumerating the exceptions to similar clauses under New York law, the court in *Evergreen Pipeline* immediately emphasized that the exceptions – including the fundamental breach exception – were limited in nature: "Lest the exceptions swallow the rule, delay clauses proscribe damages for a broad range of both reasonable and unreasonable delays." 95 F.3d at 167 (citing *Corinno Civetta Constr. v. City of New York*, 67 N.Y.2d 297, 502 N.Y.S.2d 681, 685-86, 493 N.E.2d

24

905, 909-10 (1986); *Kalisch-Jarcho, Inc. v. City of New York*, 58 N.Y.2d 377, 461 N.Y.S.2d 746, 749-50, 448 N.E.2d 413, 416 (1983)) . The court further observed:

> Moreover, the abandonment of the contract exception is limited to those situations where "the contractee is responsible for delays which are so unreasonable that they connote a relinquishment of the contract by the contractee with the intention of never resuming it." *Corinno*, 502 N.Y.S.2d at 688, 493 N.E.2d at 912. The breach of contract exception is also a narrow one and applies "only for the breach of a fundamental, affirmative obligation the agreement expressly imposes on the contractee. Typical of such claims are those in which the contractee has failed in its obligation to obtain title to the work site or make it available to the contractor so that it may commence construction of the agreed upon improvements." *Id*. Finally, the contractor's burden of proving the exception is a heavy one. *Manshul Constr. Corp. v. Board of Educ.*, 160 A.D.2d 643, 559 N.Y.S.2d 260, 261 (1st Dep't), *lv. to appeal denied*, 76 N.Y.2d 709, 561 N.Y.S.2d 913, 563 N.E.2d 284 (1990).

*Id.* The court in *Evergreen Pipeline* noted the general existence of "fundamental breach" as an exception, but did not further discuss its application to the facts of the case.

In *Forward Industries*, the court based its decision on a specific finding that the language of the exculpatory clause was ambiguous under the circumstances:

> Since the first portion of paragraph seven excuses the defendant from delays it may sustain by reason of extraordinary and unanticipated causes, the parties must have intended the no-damage-for-delay clause to apply to delay sustained by the defendant due to causes within the contemplation of the parties at the time the contract was entered into, which would preclude the defendant from completing performance by May 18 or a reasonable time thereafter. Any other construction would render the no-damage-for-delay clause repetitious and meaningless. However, it cannot be assumed from such a general no-damage-for-delay clause that it was intended to bar a claim for damages for delay caused by the defendant's breach of an essential or fundamental obligation of its contract. *Such an intent requires explicit language*. Paragraph 1 of the parties' agreement imposed upon the defendant an affirmative duty to use its "best efforts" to install an operational telephone system by May 18 or within a reasonable time after this intended cutover date. *Absent more explicit terms*, the "under no circumstances" language of paragraph 7's no-damage-for-delay provision cannot, under the rule of strict construction, be read expansively to include delays caused by the defendant's breach of such an affirmative and fundamental duty.

123 A.D.2d at 376-77, 506 N.Y.2d at 455 (citations omitted, emphasis added). Thus, the court recognized that even a fundamental breach may be excused as long as the contract language calls for such a result.

Finally, in *Clifford R. Gray*, the court merely upheld without elaboration a trial court finding of fundamental breach and delay. "[F]inding an ample basis in the record," the court concluded, "we

decline to disturb the holding that the 'no damages for delay clause' did not bar plaintiff's claim for money damages." 277 A.D.2d at 845, 716 N.Y.S.2d at 798.

Fundamental breach as an exception to a "no damages for delay" clause does not appear to have any substantial support outside of New York. In one of the few decisions outside of New York which have adopted the exception, *Mafco Elec. Contractors v. Turner Constr.*, No. 07-000114, 2009 WL 807469, at *8 (D. Conn. March 26, 2009), the court emphasized that "[t]he exception is a narrow one." And the court rejected the plaintiff's argument that a fundamental breach existed under the facts of the case:

> Mafco has not cited any case where a court, in Connecticut or elsewhere, found a breach of a fundamental obligation of contract entitling the plaintiff to delay damages despite an exculpatory clause. The only case cited by Mafco which involved a contract with an exculpatory clause is *Regional School Dist. No. 9 v. Wayne Const. Co.*, 2000 WL 727504, No. CV 990337880 S (Conn.Super. May 18, 2000). In this case, the court simply confirmed the decision of an arbitral board to award delay damages despite the arbitrator's decision not to address the no damages for delay clause, and concluded that it had no authority to overturn an arbitration award in the face of an unrestricted submission to arbitration unless the arbitrator's conduct was "egregious or patently irrational." As the arbitral board did not set forth a memorandum of decision, the decision of the court to confirm that award is of little precedential value.

> In *Earthbank Co. v. City of New York*, 172 A.D.2d 250 (1st Dept.1991), the court found that the owner's failure to obtain a wetlands permit necessary to begin construction was a fundamental breach of contract. In another case, a two-year delay caused by the owner's faulty subsurface exploration, frequent plan changes, and the invasion of protestors onto a job site were not breaches entitling a contractor to recover over a no damages for delay clause. *Blau Mechanical Corp. v. City of New York*, 158 A.D.2d 373 (1st Dept.1990). In this case, Mafco has alleged that Turner, through its subsidiary, Turner Logisitics, failed to timely provide materials and purchasing and delivery information so that Mafco could install certain light fixtures. However, *Mafco did eventually receive the materials and complete its work, except for punch list items, by September 2006 at the latest. This is not a complete failure of a condition precedent to performance*, as in Earthbank, but a delay in performance, as in *Blau*. Therefore, there is no fundamental breach. A *fundamental breach must completely frustrate the performance of one of the parties, not merely delay it for a time. See Corinno Civetta* [*Constr. v. City of New York*],, 67 N.Y.2d [297,] 313[, 493 N.E.2d 905 (1986)].

2009 WL 807469 at *8 (emphasis added).

Taken in the light most favorable to Mohawk, the evidence does not support the conclusion that the eight-month delay completely frustrated project construction. The delay, while aggravating

and expensive for the parties concerned, remained a delay. The fundamental breach exception does not apply.

## *Exception for Uncontemplated Delay*

Mohawk also argues that the "no damages for delay" clause should not apply here because the delay was not of a type contemplated by the parties. In support of its argument that such clauses have no application to "uncontemplated" delays, Mohawk draws heavily from the string citation of cases in *State Highway Admin. v. Greiner Eng'ng Sciences*, 83 Md.App. 621, 634 577 A.2d 363 (1990). (Dkt. 46 at 39-40). And again, Mohawk's Supplemental Brief essentially repeats this argument with no substantial elaboration. (Dkt. 76 at 9-11).

Mohawk fails to acknowledge on either occasion that the court in *Greiner* ultimately *rejected* the uncontemplated delay exception. Applying Maryland law but finding no controlling decision in that jurisdiction, the court indeed noted "no dearth" of cases from jurisdictions following what it termed the "New York Approach," recognizing the existence of uncontemplated delays as an exception. 83 Md.App. at 633-34, 577 A.2d at 368-69. The court, however, noted a trend among "numerous other jurisdictions" holding that uncontemplated delays should not be considered an exception to "no damages for delay" clauses. 83 Md.App. at 637, 577 A.2d at 370. The court ultimately concluded:

> We apply the above principles to the case sub judice and hold that the "Delays and Extensions of Time" clause in the contract clearly and unambiguously precludes recovery of delay damages by the appellee. The "not contemplated by the parties" exception is not recognized by the courts of this State. This is not to say that unambiguous no-damage-for-delay clauses will be enforced in every case. The better reasoned approach does not enforce the exculpatory clause where there is "intentional wrongdoing or gross negligence," [*John F.*]*Gregory & Son, Inc. v. Guenther & Sons*, [147 Wis.2d 298,] 432 N.W.2d [584,] 586 [(1988)], "fraud or

misrepresentation," *M.A. Lombard & Son Co. v. Public Building Commission*, [101 Ill.App.3d 514, 57 Ill.Dec. 209,] 428 N.E.2d [889,] 892 [(1981)], on the part of the agency asserting the clause. No such wrongdoings were alleged in this case.

Other courts addressing this issue have found persuasive the analysis of the Wisconsin Supreme Court in *John E. Gregory & Son, Inc. v. A. Guenther & Sons Co.*, 147 Wis.2d 298, 432 N.W.2d 584 (1988). In that case, the court wrote:

> [D]elay "not contemplated by the parties" is not an exception to the general rule that "no damage for delay" clauses are enforceable. We conclude that parties can mutually assent to such a clause without contemplating in particularity all of the potential causes of delay. Indeed, the adoption of a "no damage for delay" clause shows that the parties realize that some delays cannot be contemplated at the time of the drafting of the contract. The parties include the clause in the contract in order to resolve problems conclusively should such delays occur. The parties can deal with delays they contemplate by adjusting the start and completion dates or by including particular provisions in the contract. "[I]t is the unforeseen events which occasion the broad language of the clause since foreseeable ones could be readily provided for by specific language." *City of Houston v. R.F. Ball Construction Co., Inc.*, 570 S.W.2d 75, 78 (Tex.Civ.App.1978). Thus, the doctrine of mutual assent supports our conclusion that delays not contemplated by the parties should not be an exception to the rule that "no damage for delay" clauses should be enforced.

The decisions rejecting the uncontemplated delay exception appear to be both the better-reasoned approach and the modern trend among the cases. It is notable that Mohawk has pointed to no decisions actually applying this exception in the last two decades. The latest decision in the string citation Mohawk quotes from *Greiner* was decided in 1977. Mohawk does cite *United States ex rel. Evergreen Pipeline Constr. v. Merritt Meridian Constr.*, 95 F.3d 153, 167 (2nd Cir. 1996) as stating that such clauses are "generally held" to include only reasonably foreseeable delays, (Dkt. 46 at 40), but Mohawk's citation fails to indicate that this language is actually a quotation from the New York decision of a decade earlier, *Corinno Civetia Constr. Corp. v. City of New York*, 493 N.E.2d 905,911 (N.Y. 1986).[1]

---

[1]The exception has survived where controlling precedent recognizes its existence. *See United States ex rel Petrocelli Elec. v. Crow Const.*, No. 93-8387, 1999 WL 791683 (S.D.N.Y., Oct. 5, 1999); *Honeywell, Inc. v. J.P. Maguire Co.*, .No. 93-5253, 1999 WL 102762 (Feb. 24, 1992); *McPhee, Ltd. v. Konover Constr.*, 2009 WL 4846555 (Conn. Super. Oct. 22, 2009); *Commercial Elec. Contractors v. Pavarini Constr.*, No. 590630/03, 2004 WL 2282856 (N.Y. Sup. Ct. June 28, 2004).

The District Court for the Northern District of Illinois reached a similar conclusion in *Edward E. Gillen Co. v. City of Lake Forest*, No. 91-0183, 1992 WL 29995 (N.D. Ill. Feb. 12, 1982). The court there held that the plaintiff's argument of uncontemplated delay was not a valid exception to the exculpatory damages clause:

> If we were to accept Gillen's argument that the possibility that Lake Forest may provide nonconforming materials was outside the contemplation of the parties th[e]n "few elements of damage could be said to come within the contemplation of the parties. Provisions of this nature, [i.e. "no damages for delay" clauses], are usually inserted, not for the purpose of providing for that which the parties expect will happen, but to provide for situations that may arise." *Underground Constr. Co. v. Sanitary Dist. of Chicago*, 367 Ill. 360, 11 N.E.2d 361 (1937); *See also Unicon Management Corp. v. Chicago*, 404 F.2d 627, 631 (7th Cir.1968). It is clear from the terms of the contract that Supplemental Condition 12.5 protects Lake Forest from damages arising out of unforeseeable as well as foreseeable delays.

*Id.* at *4. Similarly, in *J.A. Jones Constr. v. Lehrer McGovern Bovis Inc*, 120 Nev. 277, 89 P.3d 1009 (2004), the court found that "[w]e are persuaded rejecting this [uncontemplated delay] exception is the better reasoned approach," and agreed with *Gregory* that the very purpose of such clauses is to protect against *both* foreseeable and unforeseeable delays. 120 Nev. at 277-78, 89 P.3d at 1018.

The court finds that the uncontemplated delay exception is not a bar to the application of the "no damages for delay" clause in the present action.

### Exception for Unreasonable Delay

Mohawk next argues that the "no damages for delay" clause is excluded here because of the length of the delay involved, and supports its argument by citing two decisions, *Jensen Const. Co. v. Dallas County*, 920 S.W.2d 761, 771 (Tex.App.-Dallas 1996, writ denied), *overruled on other gds., Travis County v. Pelzel & Assocs.*, 77 S.W.3d 246, 251 (Tex. 2002) and *E.C. Nolan Co. v. State*, 58 Mich.App. 294, 227 N.W.2d 323 (1975). Mohawk argues that a jury question exists as to whether there was an unreasonable delay in the completion of the Cessna project, thereby excluding application of the exculpatory clause limiting its relief to an extension for performance.

The court in *Jensen* found that the trial court had not erred in denying summary judgment against a contractor based upon a "no damages for delay" clause, holding under the facts of the case that the defendant "failed to conclusively establish that the 'no damage for delay provisions' preclude delay damages by the contractor." 920 S.W.2d at 771. Notably, the contractor in that case argued that the plaintiff county had hindered its work and alleged the existence of unreasonable delay. The court noted plaintiff's evidence showing

> specific instances of unreasonable interference which delayed and reduced the efficiency of work on the project, and required suspension of work until the rules imposed by the County could be complied with. Jensen alleged the County threatened Jensen with the loss of the early completion bonus if it did not do the work required. Jensen also alleged the withholding of payment to induce Jensen to comply with the unreasonable and arbitrary demands imposed by the County.

*Id.* at 770-71. The court did not, however, give any indication as to the length of the delay, and whether such delay alone would justify application of an exception to the "no damages for delay" clause.

In *E.C. Nolan*, on the other hand, the court directly held that that a delay of 9 ½ months in the course of a 24 month project "is in our view clearly unreasonable and excessive." 58 Mich.App. at 303-04 , 227 N.W.2d at 327. Notably, however, the exculpatory clause at issue in that case was explicitly restricted to only reasonable delays. As the court stressed:

> The 1967 Standard Specifications for Highway and Bridge Construction, which both parties admit to be part of the contract, state at § 1.05.06 in pertinent part:
>
>> * * No additional compensation will be paid to the contractor for any reasonable delay or inconvenience due to material shortages *or reasonable delays due to the operations of such other parties* doing the work indicated or shown on the plans or in the proposal.

58 Mich.App. at 301-02 , 227 N.W.2d at 326-27 (emphasis by *E.C. Nolan*).

In the present case, by contrast, the exculpatory clause in question provides that Mohawk's sole remedy for delays is contract extension; the contract itself does not reflect anything about "unreasonable" delays justifying an action for damages. The issue, therefore, is whether a delay of eight months, standing alone, is sufficient to deny the application of an otherwise unambiguous exculpatory clause. The court finds it is not.

30

In this context, the court finds persuasive the analysis in the recent *Mafco* decision. There, the court wrote generally with respect to the "uncontemplated" delay exception, but also addressed a claim of unreasonable delay:

> "For a delay to be uncontemplated, it must be uncontemplated by both parties, or more objectively stated, must not be reasonably forseeable." *White Oak* [*Corp. v. Dept. of Trans.*], 585 A.2d [1199,] 1204 [(Conn. 1991)]. Delays of a type described in the contract are not uncontemplated. Delays can only be considered uncontemplated because of length alone if they are so lengthy as to constitute an abandonment of the contract. *Id.* "[The plaintiff's] position, that it was not required to anticipate an 'inordinate' delay, is simply unfounded." *Id.* (finding six-month delay period not inordinate). . . . A construction delay of two months in a multi-year, multi-million dollar construction contract is not inordinate. Even if Mafco were not estopped from stating that it achieved substantial completion on March 31, 2006, and the Court instead credited Mafco's expert's estimation that Mafco was not substantially complete until September 2006, *a delay of seven months has not, in any case, been found to be a delay constituting an abandonment of the contract.* Therefore, the Court concludes that it should enforce the no damages for delay clause.

2009 WL 807469 at *7 (footnote omitted, emphasis added). In reaching this conclusion, the *Mafco* court noted other decisions finding that specific delays were not an abandonment of the contract. *See White Oak*, 585 A.2d at 1204 (six months); *T.J.D. Construction Co. v. City of New York,* 295 A.D.2d 180, 743 N.Y.S.2d 111 (1st Dept. 2002) (seven months); *Blau Mechanical Corp. v. City of New York*, 158 A.D.2d 373, 551 N.Y.S.2d 228 (1st Dept. 1990) (two years); *Kalish-Jarcho, Inc. v. City of New York*, 58 N.Y.2d 377, 385, 448 N.E.2d 413 (28 months).

As Mohawk notes, its unreasonable delay exception is "related to" the uncontemplated delay exception (Dkt. 46 at 42), and the court finds that former exception should be rejected for the same reason as the latter. That is, the very purpose of such clauses, provided they are otherwise unambiguous in nature, is to reduce the opportunity for second-guessing about whether any particular delay was reasonable or unreasonable. In the present case, both parties to the Subcontract were knowledgeable and sophisticated commercial enterprises.

Mohawk could have sought a ceiling on the maximum allowable delay permitted under Section 4.3. Or, in the absence of such a provision, it could adjust its contract price to allow for the uncertainties of delays. What it cannot do is enter into an unambiguous contract excluding claims

for damages arising from construction delays, and then advance such a claim based upon the length of the delay alone, unless the delay was so great that it demonstrated an abandonment of the contract. Here, the evidence demonstrates no such intent to abandon the contract. On the contrary, the evidence establishes that throughout the eight-month delay, Law actively if unsuccessfully attempted to hurry its subcontractors. Further, during the delay Law and Mohawk were in frequent communication relating to the causes for the delay, its effects, and the efforts which were being made to shorten the delay. A reasonable contractor in Mohawk's position would not have understood Law to be abandoning the contract.

### Other Exceptions: Active Interference and "Non-Delay" Damages

In its Opposition to the Motion for Summary Judgment, Mohawk argued generally that, even if the "no damages for delay" clause was valid and enforceable, it was inapplicable here because of three recognized exceptions: (1) the delay here was outside that contemplated by the parties, (2) the delay was unreasonable, and (3) there was a fundamental breach of the contract. Mohawk also presented two additional arguments, arguing (4) the delay clause was also unavailable because of the active interference by Law, and (5) because the damages it incurred were not really "delay damages," and thus fall outside the scope of the exculpatory provision. In its Supplemental Brief, Mohawk reiterates facts which it claims supports each of these arguments.

In its prior Order, the court found these claims were new issues which fell outside the language of the Pretrial Order. (Dkt. 54 at 11). The court therefore rejected each of these "new issues," which the court specifically found to include the arguments "that the delays were caused by the 'active interference' of Law, … and that its damages are not really 'delay damages.'" (*Id* at 10, 11).

The Court of Appeals held that three of the five issues rejected by this court were implicit in the general language contained in the Pretrial Order.

In its summary judgment ruling, the district court refused to consider three alternative arguments advanced by Mohawk. Mohawk asserted that even if the "no

damages for delay" provisions were valid and had not been waived or modified, the provisions did not apply to the conduct at issue because: (1) such an extreme delay was not contemplated by the parties; (2) the delay was "unreasonable"; and (3) Law's alleged actions constituted a "fundamental breach." The district court concluded that these arguments were not encompassed within the final pretrial order and thus did not consider them.

577 F.3d at 1171. The Court of Appeals then held that these three claims were directly tied to the validity of the "no damages for delay" provision. The court concluded by holding: "On remand, the district court should address Mohawk's three alternative contentions as to why these provisions may not apply." *Id*. at 1172. The court's opinion makes no mention of the other two arguments denied by this court – that there was active interference in the contract and the damages Mohawk seeks are not really "delay damages."

The court's prior rejection of the active interference and "nondelay damages" exceptions remain the law of the case. Even if the court were to consider these exceptions, the court could only conclude that they are inapplicable in the light of the evidence and circumstances in the present case.

In support of its active interference argument, Mohawk correctly quotes the observation made by the Eighth Circuit in *United States Steel v. Missouri Pac. R*., 668 F.2d 435, 438 (8th Cir. 1982) that "there is implied an obligation on the part of the contractee to refrain from anything that would unreasonably interfere with the contractor's opportunity to proceed ... with reasonable economy and dispatch." But Mohawk neglects to note what immediately following the quoted language, which emphasizes the limited nature of this exception:

> Liability, however, is not created merely because of claimed interference caused by the delay of another contractor employed by defendant, after all, this is precisely the type of liability which the no damage clause seeks to prevent. *Nor is defendant liable for delay resulting from a simple mistake, error in judgment, lack of total effort, or lack of complete diligence*. As the name implies, active interference requires *a finding that defendant committed some affirmative, willful act in bad faith* which unreasonably interfered with the contractor's compliance with the terms of the construction contract.

*Id*. at 439 (internal quotation and citations omitted, emphasis added). *See also Peter Kiewit Sons' Co. v. Iowa S. Utils.*, 355 F.Supp. 376, 399 (S.D.Iowa 1973); *Phoenix Contractors, Inc. v. Gen. Motors Corp.*, 135 Mich.App. 787, 794, 355 N.W.2d 673, 677 (1984); *P.T. & L. Constr. v. State*,

108 N.J. 539, 531 A.2d 1330, 1343 (1987).

The evidence in the present action does not support application of the active interference exception. Taken in the light most favorable to Mohawk, the evidence might be taken to show errors in judgment or a lack of diligence on the part of Law in its supervision of its subcontractors. But Mohawk has presented no evidence showing that Law intentionally or in bad faith sought to prevent or hinder Mohawk's work on the project.

On the contrary, Mohawk's own evidence compels otherwise. Mark Cybulski, Mohawk's key witness in the present action and a Rule 30(b)(6) representative, testified:

> Q. Okay. Are you – you're not claiming, as I understand it, that the owner intentionally interfered with you, correct?
>
> A. No.
>
> Q. Or that Law Company intentionally interfered with you?
>
> . . . .
>
> A. I don't think it was their intent to hold us up.
>
> Q. Okay. I mean, in all fairness, sir, you and Law were both trying to get this job done as quickly as you could. Correct?
>
> A. That was originally the plan, yes. We were there to build a building.

(Plf. Exh. C at 42-43).

Finally, Mohawk argues that the damages it seeks here are not pure "delay damages," but damages from other causes. In its prior Order, this court identified elements of Mohawk's damages claims and held that the "very broad" contract provision excluded most of Mohawk's damages

> even though the defendant attempts to characterize these as not "pure delay damages." Under Sections 3.1 and 3.5, the subcontractor is restricted in its compensation for delays to revisions to the schedule only. Section 4.4 expressly provides that in the event of delay, schedule extension is the "sole remedy" of the contractor in the event of delay. An action for damages — however those damages are described or denominated — is a remedy which is not permitted under the contract.

(Dkt. 54 at 13).

For its argument, Mohawk relies exclusively on *John E. Green Plumbing & Heating v.*

*Turner Const.*, 742 F.2d 965 (6th Cir. 1984), *cert. denied*, 471 U.S. 1102 (1985), where the court held that a "no damages for delay" clause only barred a subcontractor's claims for delay damages, and not damages arising from active roadblocks to performance set up by the contractor. "[D]elay means time lost where work cannot be performed because essential supplies have not been delivered or necessary preliminary work has not been performed." *Id.* at 967. The court held the trial court had erred in not permitting the plaintiff subcontractor to show damages arising from "hindrances" – damages caused by the contractor's intentional inference in the subcontractor's work.

*John E. Green* does not represent, as Mohawk argues, an *additional* exception to the application of "no damages for delay" clauses. It is instead simply a restatement of the active interference exception. In *John E. Green*, the court held that there was error in granting summary judgment in favor of the contractor based upon a "no damages for delay" clause, but also held that the error was harmless, because the subcontractor was allowed to proceed to trial on its claim of intentional interference with contract claim, a claim which the Court of Appeals held was properly rejected on directed verdict by the trial court. *See River City Constr. v. ABC Paving*, No. 250721, 2005 WL 599713, *3 (Mich. App. March 15, 2005) (per curiam) (noting that *John E. Green* was premised on the court's finding the contractor had "intentionally interfered with its [subcontractor's] work by such acts as turning off the heat and ordering work done out of sequence").

Accordingly, the court finds that Mohawk's argument should be rejected for the same reason as its active interference argument: it has failed to provide evidence showing Law acted intentionally or in bad faith to create delays. At most, the evidence shows ineffective or erroneous management of the project, which is insufficient to justify suspending or ignoring the clear language of the Subcontract prohibiting claims for damages.

*Waiver*

As in its Opposition to the Motion for Summary Judgment, Mohawk's its Supplemental Brief (Dkt. at 14-21) asserts that Law has waived its power to enforce the "no damages for delay" provision. In support of its argument, Mohawk relies in particular on language from the Kansas Court of Appeals decision in *Saddlewood Downs v. Holland Corp.*, 33 Kan.App.2d 185, 193-94, 99 P.3d 640, 646-47 (2004):

> The question of whether a written contract may be modified, waived, annulled, or wholly set aside by any subsequently executed contract, whether that contract be in writing or parol, has long since been set to rest. Nearly a century ago in *Hill v. Maxwell*, 71 Kan. 72, 75, 79 P. 1088 (1905), the court stated:
>
>> 'It is well settled that the terms of a written contract cannot be varied by any previously executed contract, written or parol, nor by any contemporaneous parol contract. It is equally settled, that the terms of a written contract may be varied, modified, waived, annulled, or wholly set aside, by any subsequently executed contract, whether such subsequently executed contract be in writing or in parol.' (*Todd v. Allen*, 18 Kan. 543, 544. *See*, *also*, 29 A. & E. Encycl. of L. 829).
>
> The terms of a written contract can be varied, modified, waived, annulled, or wholly set aside by any subsequently executed contract, whether such subsequently executed contract be in writing or parol. *Coonrod & Walz Const. Co., Inc. v. Motel Enterprises, Inc.*, 217 Kan. 63, 73, 535 P.2d 971 (1975). This is generally the case in building and construction contracts as well:
>
>> A provision in a private building or construction contract that alterations or extras must be ordered in writing can be avoided by the parties to the contract when their words, acts, or conduct amount to a waiver, modification, rescission, abrogation, or abandonment of the provision, or when the owner (or the general contractor in the case of a subcontractor) by his or her acts or conduct is estopped from reliance on it. 13 Am.Jur.2d, Building and Construction Contracts § 25, p. 28.

In its prior Order, this court held that Law had not waived its right to enforce the "no damages for delay" cause for three reasons. First, the court held that Uniform Commercial Code governed the Subcontract, and Section 27 of the Subcontract expressly prohibited subsequent oral modifications. Under K.S.A. 84-2-209(2), any such modifications can occur only through signed writings. (Dkt. 54 at 11). Citing *DP-Tek, Inc. v. AT&T Global Information Solutions*, 891 F.Supp. 1510 (D. Kan. 1995), *aff'd*, 100 F.3d 828 (10th Cir. 1996) (applying 84-2-209(2)), the court found

that the evidence presented to the court failed to demonstrate the existence of a waiver.[2]

Second, this court went on to hold that even without the express prohibition on oral modification

> the common law generally requires consideration for modifications to a written contract. *Byers v. Transp. Co. v. Fourth Nat'l Bank & Trust*, 333 F.2d 822, 826 (10th Cir. 1964). Kansas courts have repeatedly emphasized the need for additional consideration before enforcing oral modifications of prior written agreements. *See Augusta Med. Complex v. Blue Cross*, 227 Kan. 469, 608 P.2d 890 (1980); *Hummel v. Wichita Federal Sav. & Loan Ass'n*, 190 Kan. 43, 372 P.2d 67 (1962). Merely doing what one is already obligated to do is not consideration under Kansas law. *Apperson v. Security State Bank*, 215 Kan. 724, 528 P.2d 1211, 1219 (1974). Mohawk has failed to identify any consideration for such an agreement to modify or suspend any portion of the contract. Mohawk offered nothing in exchange for the purported agreement which it was not already obligated to provide under the original contract.

(Dkt. 54 at 12).

Finally, the court held that even in the absence of the "no oral modifications" clause and assuming the existence of consideration

---

[2]U.C.C. § 2-209(4) provides that attempted modifications which fall short of the requirements of § 2-209(2) may still "operate as a waiver." In *Wisconsin Knife Works v. National Metal Crafters*, 781 F.2d 1280, 1286-87 (7th Cir. 1986), the Seventh Circuit recognized the potential conflict between the two subsections, and concluded that waiver under the U.C.C. required proof of reliance:

> The path of reconciliation with subsection (4) is found by attending to the precise wording of (4). It does not say that an attempted modification "is" a waiver; it says that "it can operate as a waiver." It does not say in what circumstances it can operate as a waiver; but if an attempted modification is effective as a waiver only if there is reliance, then both sections 2-209(2) and 2-209(4) can be given effect. Reliance, if reasonably induced and reasonable in extent, is a common substitute for consideration in making a promise legally enforceable, in part because it adds something in the way of credibility to the mere say-so of one party. The main purpose of forbidding oral modifications is to prevent the promisor from fabricating a modification that will let him escape his obligations under the contract; and the danger of successful fabrication is less if the promisor has actually incurred a cost, has relied. There is of course a danger of bootstrapping-of incurring a cost in order to make the case for a modification. But it is a risky course and is therefore less likely to be attempted than merely testifying to a conversation; it makes one put one's money where one's mouth is.

U.C.C. § 2-209(5) also reflects these considerations, providing that a waiver may be withdrawn prior to detrimental reliance by the opposing party.

waiver would not be established on the facts cited by Mohawk. These involve mere generalities, such as alleged statements by Law personnel, in response to Mohawk's complaints, that Mohawk would be "taken care of." The court finds that such ambiguous statements do not meet the requirement of demonstrating clearly the nature of a putative oral modification to a written contract. *See Kers & Co. v. ATC Communications Group*, 9 F.Supp. 2d 1267, 1272 (D. Kan. 1998) (applying Delaware law).

(*Id.*)

The court finds that, construing all of the evidence in the light most favorable to Mohawk, a rational fact-finder could conclude that Law had communicated that it would not enforce the exculpatory clause. Specifically, in addition to the evidence noted in the court's earlier Order, the jury could consider the evidence supplied by Mark Cybulski as to his conversations with Law's representatives. If the jury found Cybulski credible, it could conclude that Law also affirmatively promised to pay Mohawk for the costs of the delay. There is evidence that Law told Mohawk that it would "be fair" about additional costs. Further, throughout the relevant period, Law never indicated to Mohawk that it intended to rely on any of the exculpatory provisions in the contract.[3] Taking all of the evidence collectively and in the light most favorable to the defendant, the court

---

[3]Law argues (Dkt. 72 at 20) that its failure to formally invoke the "no damages for delay" clause is not relevant, because the contract does not call for such formality. It also correctly notes that Kansas law requires more than silence to create a waiver, citing *Patrons Mut. Ins. v. Union Gas Sys.*, 250 Kan. 722, 726-27, 830 P.2d 35, 39 (1992). In *Patrons*, the court wrote:

> The question of waiver is one of fact or a mixed question of law and fact. *Hurlbut v. Butte-Kan. Co.*, 120 Kan. 205, 206, 243 Pac. 324 (1926). Waiver must be manifested in some unequivocal manner by some distinct act or by inaction inconsistent with an intention to claim forfeiture of a right. Mere silence of a party is not waiver unless such silence is under circumstances requiring the party to speak. *See Marker v. Preferred Fire Ins. Co.*, 211 Kan. 427, 434, 506 P.2d 1163 (1973).

*See also Long v. Clark*, 90 Kan. 535, 135 P. 673 (1913) (noting "general rule that mere indulgence or silence cannot be construed as a waiver, unless some elements of estoppel can be invoked").

If the only evidence in the case were Law's failure to invoke the "no damages for delay" clause, its argument would be persuasive. In the present case, however, the court is presented not with "mere silence," but a consistent silence as to the exculpatory clause coupled with affirmative representations that Law would "take care of" or pay Mohawk's costs.

finds a rational fact-finder could conclude that Mohawk has met its burden of showing an unequivocal intent to waive the enforcement of the "no damages for delay" clause. But that is still insufficient to allow Mohawk to proceed on the asserted basis.

Under Kansas law, consideration is a requirement for both oral modifications to the contract and waiver. In *Riley State Bank v. Spillman*, 242 Kan. 696, 750 P.2d 1024 (1988), the Kansas Supreme Court held that the plaintiff bank had not waived its right to declare default against debtors in light of a provision limiting oral modifications and the absence of consideration. The court noted:

> In *Byers Transp. Co. v. Fourth Nat. Bank & Trust Co., Wichita*, 333 F.2d 822 (10th Cir.1964), a contract case, the court held the conduct of the parties changed the written contract provisions, but noted under Kansas law such modification of a written contract must be supported by consideration independent and separate from the original consideration supporting the contract. *See Augusta Medical Complex, Inc. v. Blue Cross*, 227 Kan. 469, 608 P.2d 890 (1980). The Spillmans make no claim to have given new consideration to support the modification of the terms of the written note.

> The security agreement contained explicit limitations on the ability of the parties to modify its terms through a course of conduct. It stated: "No waiver by the Secured Party of any default shall be effective unless in writing nor operate as a waiver of any other default or of the same default on a future occasion." The clear meaning of the language is the Bank's lack of objection to late payments did not operate as a waiver, as there is not evidence such a waiver was given in writing, and the Bank's tolerance of late payments did not waive its right to claim a default in the future. Plain and unambiguous language must be interpreted according to its ordinary meaning. *Quenzer v. Quenzer*, 225 Kan. 83, 587 P.2d 880 (1978).

> The clear meaning of the security agreement establishes the Bank did not waive its right to declare default upon late payment or failure to pay in the proceeds of the bulk sale.

242 Kan. at 701, 750 P.2d at 1028.

Similarly, in *In re Marriage of Woods and Lash*, No. 93,251, 2006 WL 619187, *6 (Kan.App. March 10, 2006), the Kansas Court of Appeals confirmed this view recently, agreeing explicitly with the district court's holding that "as with any contract, this waiver requires consideration. Under Kansas law, independent consideration is required to modify the terms of a contract." In *Marriage of Woods*, the parties disputed the continuing effect of an obligation in the property settlement agreement to pay for college expenses, the husband contending that the obligation had been waived by his son, Daniel. The court wrote:

the waiver could operate to disclaim the duty owed to Daniel "only if the requirements are met for discharge of a contractual duty." Restatement [(Second) of Contracts] § 306, comment (b). Such requirements appear to include consideration. *See* Restatement (Second) of Contracts § 273 (1981) (stating general rule that obligee's manifestation of assent to discharge is ineffective unless such is made for consideration[,] is made in circumstances in which promise is enforceable without consideration or has induced action or forbearance that would make promise enforceable); Calamari & Perillo, *Law of Contracts* § 17.11 n. 19 (4th ed.1998) (interpreting requirements for discharge after manifestation of assent to include consideration).

> "Consideration is defined as some right, interest, profit, or benefit accruing to one party, or some forbearance, detriment, loss, or responsibility, given, suffered, or undertaken by the other." 17A Am.Jur.2d Contracts § 113, p. 129. A promise is without consideration when the promise is given by one party to another without anything being bargained for and given in exchange for it. 2 Corbin on Contracts § 5.20 (rev. ed.1995).

*Id*. (*quoting Varney Business Services, Inc. v. Pottroff*, 275 Kan. 20, 32, 59 P.3d 1003 (2002)). The Court of Appeals held that the trial court "correctly determined the document signed by Daniel was not supported by consideration," and "[a]ccordingly we find the district court did not err in finding the waiver invalid and ineffective." *Id*. at *7.

These decisions reflect earlier Kansas decisions. Thus, in *Wheeler v. Beem*, 111 Kan. 700, 208 P. 626, 627 (1922), the court held that a sewer access right was not an "incumbrance" within meaning of a land sales contract, thereby permitting defendant purchase to void the contract, and thus rejecting defendant's argument that there had been an "oral modification of the contract, or waiver requiring a new consideration." Similarly, in *George v. Lane*, 80 Kan. 94, 102 P. 55, 56-57 (1908), the court wrote that a waiver of contract rights was only effective when there was a *mutual* waiver by both parties:

> Evidence was offered tending to show that, shortly after the exchange of the properties, the plaintiffs verbally waived the agreement of defendants to produce a purchaser, and *the jury were instructed, in substance, that such waiver was of no force, unless there was an independent consideration therefor, or that by reason thereof the defendants had changed their positions or condition in reliance upon it to their loss or damage*. It is contended that this instruction was erroneous, because the parties to a contract may at any time rescind it, in whole or in part, by mutual consent, and the surrender of their mutual rights is a sufficient consideration. *Flegal v. Hoover et al., Appellants*, 156 Pa. 276, 27 Atl. 162. This may be done where there are mutual rights to be surrendered, but in this case the plaintiffs had executed the agreement on their part. The only remaining obligation of the contract was upon the

defendants. A naked promise to release them, if made, was without consideration; and, unless acted upon so that some loss or injury would result to them if the promise was not kept, it was ineffectual to relieve them from liability. *Collyer & Co. v. Moulton et al.*, 9 R. I. 90, 98 Am. Dec. 370; *Moore v. Detroit Locomotive Works*, 14 Mich. 266; 9 Cyc. 594. *The instruction of the court upon this subject was correct.*

(Emphasis added). *See also Aultman & Taylor Co. v. Donnell & Coooper*, 9 Kan.App. 813, 6 P. 482, 484 (1900) (holding that buyer's waiver of allegedly defective thresher was effective, since the seller's "extension of the time of the payment of the note is a sufficient consideration for the waiver").[4]

Mohawk, it its Supplemental Brief, does not argue that Kansas law does not require consideration for a waiver. Rather, it argues that such consideration exists under the facts of the case. (Dkt. 73 at 14-16). Specifically, it compares this case to the circumstances presented in *Saddlewood.* That is, Mohawk stresses that it was injured because it was forced to work on the Cessna project for an additional eight months, instead of the scheduled four. (Dkt. 73 at 15). Other than the extent of the delay, however, the only evidence Mohawk cites relevant to the issue of consideration is that it had to work "much of its work out-of-sequence," which Mohawk couples with a generic reference to Cybulski's 47-paragraph affidavit. (*Id.*) That affidavit, in turn, is equally conclusory, stating in one paragraph that there were "numerous Project delays, suspensions of work, out-of-sequence work, and inefficiently performed work." (Def. Exh. 11 at ¶ 16).

Mohawk's reliance on *Sandlewood* is misplaced. In that case, the court specifically held, based upon the trial court's conclusions following a bench trial, that the defendant pavement contractor had been obliged to perform additional, fly ash stabilization work which was outside the scope of the original contract:

> We agree with the trial court's conclusion that fly ash stabilization work was not part of the original contract and Holland was entitled to additional payment for the work.

---

[4] Courts from other jurisdictions have concluded that a waiver of contractual rights may occur in the absence of consideration. *See, e.g., Nelson v. Estes*, 154 Ill.App.3d 937, 942, 507 N.E.2d 530 (Ill.App. 2 Dist. 1987) ("new consideration is not necessary where performance of a written contract is waived"); *Nassau Trust Co. v. Montrose Concrete Prods.*, 56 N.Y.2d 175, 183-84, 451 N.Y.S.2d 663,436 N.E.2d 1265 (1982) ("[n]either waiver ... nor estoppel ... rests upon consideration").

There are three critical and distinguishing facts to support this determination: (1) the absence of a request to include potential fly ash stabilization work in the bid package; (2) the contract does not contain a line item where the parties agreed fly ash would be included; and (3) the negotiations on the costs of the fly ash work, indicating it was viewed by the parties as an additional item. Under the facts of this case, the fly ash stabilization work is not properly considered a "subsidiary" item to the contract.

33 Kan.App.2d at 192, 99 P.3d at 646.

In the present case, the problem with Mohawk's reliance on the existence of out-of-sequence work is not simply that the allegation is conclusory and unquantified. Rather, Mohawk's argument fails to acknowledge the effect of the "no damages for delay" clause itself. That is, in the absence of intentional misconduct or bad faith delays on the part of Law – and, as noted earlier, the court finds no evidence supporting such findings – the "no damages for delay" clause effectively required Mohawk to continue work, even if this resulted in some additional delay or some out-of-sequence work.

Mohawk voluntarily entered into a contract which expressly provided that its sole remedy, in the case of project delay, was to ask for more delay. Accordingly, the circumstances Mohawk cites do not fall outside the scope of its original obligations. In coping with that delay, Mohawk did nothing which it was not compelled to do by the Subcontract. Accordingly, in the absence of additional consideration, Law did not waive its right to enforce the provisions of the Subcontract.

### Estoppel

Mohawk next argues that Law should be estopped from the protection of the "no damages for delay" clause. In its prior Order, the court rejected this argument, noting the cursory nature of Mohawk's argument:

It contends, in a purely conclusory fashion, that Law should be estopped from relying on the no-damages-for-delay clause, since it relied on Law's actions and representations to its detriment. But the argument is in error since Mohawk has failed to show any real change in its position. *PMA Group v. Trotter*, 281 Kan. 1344, 1352, 135 P.2d 1244 (2006). That is, Mohawk was already obliged to perform under the contract, and was obliged to do so without seeking any additional damages, its remedy being restricted solely to extensions of time for performance. Thus, Mohawk incurred no additional detriment which would support a claim for estoppel.

(Dkt. 54 at 12-13).

The Court of Appeals opinion does not directly address this ruling. Further, Mohawk makes no mention of estoppel in its Supplemental Brief. It makes no attempt to demonstrate how the facts of the case demonstrate reliance by the performance of some actions which it was not already obliged to perform. The court finds that its prior ruling correctly granted summary judgment to Law on Mohawk's estoppel claim.

### *Damages Limitation*

In its prior Order, the court held that Mohawk could not recover for damages which were in reality damages incurred by its subcontractor Viking. First, the court held that Mohawk had failed to demonstrate the existence of any pass-through agreement which would authorize Mohawk to recover for Viking's damages. (Dkt. 54 at 14). Second, the court held that in any event Mohawk should be estopped from asserting any damages owed to Viking in light of the representation, in its January 24, 2006 certification of payment, that all of its subcontractors had been paid in full. (*Id.* at 14-15).

The Court of Appeals held that, read in the light most favorable to Mohawk, there was evidence of an informal pass-through agreement of the type recognized in *Roof-Techs International, Inc. v. Kansas*, 30 Kan.App.2d 1184, 57 P.3d 538, 550-54 (Kan. Ct. App. 2002). 577 F.3d at 1173. The court also held that estoppel was inapplicable because the certification included the following exclusion:

> The signing and execution of this Certification of Payment of Outstanding Retainage Amount is not meant to affect or relinquish Subcontractor's right to claim or recover the following:
>
> (a) Any and all damages incurred by Subcontractor at the Project, regardless of whether said damages resulted from the actions or inactions of Contractor, including but not limited to all damages of which Contractor has been placed on notice by Subcontractor in its letter to Contractor dated November 17, 2004.

The Court of Appeals, adding emphasis to the last clause of (a) above, concluded that:

[b]ased on the plain language of the certification, Mohawk cannot be said to have

released any claims identified in its November 17, 2004, letter. That letter claimed $255,753 in damages—the same damages for delay figure Law cited in its declaratory judgment complaint. Accordingly, the damages claimed in the November 17 letter are the very damages at issue here, and Mohawk is not estopped from claiming them.

577 F.3d at 1173.

In its Supplemental Brief, Law argues that, pursuant to the opinion of the Court of Appeals, Mohawk is estopped from making any claim in excess $255,753 based upon the "the very damages at issue here" language used by the Court of Appeals. The court finds that Law's argument would be well taken, but for the "including but not limited to" language also included in the Certification. In light of this language, this court holds that the Court of Appeals opinion should not be construed to effectively limit Mohawks's damages claims to $255,753.

The court finds that a material question of fact exists as to whether a pass-through agreement exists, under which Mohawk has standing to recover for damages actually incurred by Viking. Assuming it has standing, the court finds that Mohawk is not estopped from recovering Viking damages in excess of $255,753.

However, this finding is rendered inconsequential given the court's holding that the "no damages for delay" clause is valid and enforceable. The court further finds that none of the cited exceptions to such clauses is applicable. Finally, the court finds that Law is not precluded by Kansas law from asserting that clause by reason of waiver or estoppel.

IT IS ACCORDINGLY ORDERED this 16th day of March that the plaintiff's Motion for Summary Judgment (Dkt. 42) is granted for the reasons provided herein.

s/J. Thomas Marten
J. THOMAS MARTEN, JUDGE